189 F.3d 989 (9th Cir. 1999)
 JULIE H. BIGGS,Plaintiff, and GERARD E. BIGGS; HOLLY G. BIGGS, Plaintiffs-Appellees,
v.
BEST, BEST & KRIEGER, A Law Partnership, as an agency & as City Attorney of Redlands; DALLAS HOMES, Individually & as a Partner of Best, Best & Krieger; ANNE T. THOMAS, Individually & as a Partner of Best, Best & Krieger, Defendants,
and
JAMES FOSTER, Individually & in his official capacity as Redlands City Councilmember; SWEN LARSON, Individually & in his official capacity as Redlands City Councilmember. Defendants-Appellants.
JULIE H. BIGGS,Plaintiff, and GERARD E. BIGGS; HOLLY G. BIGGS, Plaintiffs-Appellants,
v.
BEST, BEST & KRIEGER, A Law Partnership, as an agency & as City Attorney of Redlands; DALLAS HOMES, Individually & as a Partner of Best, Best & Krieger; ANNE T. THOMAS, Individually & as a Partner of Best, Best & Krieger, Defendants, JAMES FOSTER, Individually & in his official capacity as Redlands City Councilmember; SWEN LARSON, Individually & in his official capacity as Redlands City Councilmember. Defendants-Appellees.
 No. 97-55233 No. 97-55573
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted August 5, 1999--Pasadena, California
Decided August 30, 1999
 
 Richard R. Terzian and Kristin A. Pelletier, LeBoeuf, Lamb, Green & MacRae, Los Angeles, California, for the defendants-appellants.
 Michelle Williams Court and Barrett S. Litt, Litt & Associates, Los Angeles, California, for the plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California; Robert J. Timlin, District Judge, Presiding. D.C. Nos. CV-94-00106-RT-JRx, CV-94-00106-RT.
 Before: Cynthia Holcomb Hall and Thomas G. Nelson, Circuit Judges, and James Ware,[1] District Judge.
 HALL, Circuit Judge:
 
 
 1
 Julie Biggs was an associate at a private law firm that performed the services of city attorney to the City of Redlands. Two Redlands city councilmen, James Foster and Swen Larson (the "council defendants"), allegedly threatened to fire the law firm unless the political activities of the Biggs family were stopped. Eventually, the private law firm fired Julie Biggs and the Biggs family instituted the present 42 U.S.C. S 1983 action, alleging that the council defendants had violated the Biggs' First Amendment rights. The district court granted the council defendants summary judgment based on qualified immunity for the claims of Julie Biggs, but refusedto grant summary judgment on the claims of Julie Biggs' husband and daughter.
 
 
 2
 We have jurisdiction to review the denial of the council defendants' request for summary judgment with respect to the claims of Julie Biggs' husband and daughter pursuant to 28 U.S.C. S 1291, and we reverse. We have jurisdiction to consider Julie Biggs cross-appeal pursuant to 28 U.S.C.S 1292, and we affirm.
 
 I.
 
 3
 Julie Biggs was an attorney in the Public Law Department of Best, Best & Krieger ("BBK"), a private law firm, from November of 1988, until June 24, 1993. A BBK partner, Dallas Holmes, was the city attorney for Redlands, California, and another BBK partner, Dan McHugh, served as Redlands' deputy city attorney. BBK provided city attorney services to Redlands pursuant to a contract, under which the firm was paid on an hourly basis.
 
 
 4
 In October of 1991, Holmes allegedly told Julie Biggs that she should limit the involvement of her husband, Jerry Biggs, in Redlands politics because it could jeopardize BBK's contract with the city. Jerry Biggs had signed a letter published in a local newspaper that endorsed a certain candidate for Redlands City Council. More relevant for the purposes of these appeals, sometime in July of 1992, Redlands City Councilmen James Foster and Swen Larson allegedly told Holmes that Jerry Biggs had been seen distributing petitions to recall Chuck Demirjyn, the Mayor of Redlands. The council defendants told Holmes that Jerry Biggs should stop his activities. The daughter of Julie Biggs and Jerry Biggs, Holly Biggs, had also been involved in this campaign, and was generally active in Republican politics. In addition, Foster allegedly told BBK partners that Julie Biggs had supported a recall petition against him. Foster threatened to fire BBK as city attorney unless the Biggs "family was silenced in Redlands community politics."
 
 
 5
 After these statements were made, Julie Biggs' position at BBK steadily deteriorated, and Holmes and other BBK partners made it clear that she would no longer make partner. Approximately one week after the Biggs family filed administrative claims and law suits against the City of Redlands and councilmen Foster and Larson, BBK fired Julie Biggs on June 24, 1993, because of the ethical conflicts created by her suit and the firm's duties to its client, Redlands.
 
 
 6
 In U.S. District Court the Biggs family raised various causes of action against the council defendants. Their complaint alleged, pursuant to 42 U.S.C. S 1983, that the council defendants had violated the Biggs' First, Fourth, Fifth, and Fourteenth Amendment rights under the U.S. Constitution.[2] On June 23, 1994, District Judge McLaughlin dismissed the Biggs' Fourth Amendment claims, in addition to Jerry and Holly Biggs' Fifth Amendment claims.
 
 
 7
 On December 23, 1996, District Judge Timlin considered motions for summary judgment brought by the council defendants. The district court granted summary judgment to the council defendants on Julie Biggs' First Amendment claims because Julie Biggs had not demonstrated that the law was clearly established that the council defendants would have violated her First Amendment rights by threatening to fire BBK for the political activities of her and her family. See Branti v. Finkel, 445 U.S. 507 (1980). Alternatively, the court reasoned that it was not clearly established that Julie Biggs' act of suing her client was not disruptive under Pickering v. Board of Educ., 391 U.S. 563, 568 (1968), and Connick v. Myers, 461 U.S. 138 (1983). The court further held thatthe council defendants would be entitled to qualified immunity because it was not clearly established as of July, 1992, that First Amendment retaliation claims could be based on the firing of an employee of an independent contractor.[3]
 
 
 8
 The district court, however, rejected the council defendants' motion for summary judgment with respect to the First Amendment claims of Jerry and Holly Biggs. The court interpreted the council defendants to be arguing that they were entitled to summary judgment on these claims simply because they were entitled to qualified immunity as to Julie Biggs. The court first clarified that in holding that the council defendants' actions did not violate Julie Biggs' clearly established rights, it had not held that no First Amendment violation had occurred. Second, the court rejected the council defendants' motion because they had not cited any authority to support their claim that their acts must be unconstitutional with respect to Julie Biggs in order for Jerry and Holly Biggs to be able to bring their own separate First Amendment claims. Alternatively, the court noted that the council defendants had cited no authority to support any claim that they were automatically entitled to qualified immunity on Jerry and Holly Biggs' claims because they received qualified immunity on Julie Biggs' claim.
 
 
 9
 The council defendants appeal the district court's order denying them summary judgment on Jerry and Holly Biggs' claims based on qualified immunity. Julie Biggs cross-appeals the district court's grant of summary judgment to the council defendants on her First Amendment claims based on qualified immunity.
 
 II.
 
 10
 We review de novo the district court's grant of summary judgment, resolving all factual disputes in favor of the nonmoving party. See Herb Hallman Chevrolet, Inc. v. Nash-Holmes, 169 F.3d 636, 642 (9th Cir. 1999), petition for cert. filed, 68 U.S.L.W. 3022 (U.S. July 2, 1999) (No. 99-52). The district court's decision that the council defendants were entitled to qualified immunity is also reviewed de novo. See id. Finally, we consider de novo a denial of summary judgment based on qualified immunity to the extent that the parties raise the "purely legal" issue of whether the right allegedly violated was clearly established. See Moran v. State of Washington, 147 F.3d 839, 844 (9th Cir. 1998).
 
 III.
 
 11
 The parties devote the majority of their arguments to the issue raised on cross-appeal: Whether the council defendants were entitled to summary judgment on Julie Biggs' First Amendment claim based on qualified immunity.
 
 A.
 
 12
 "Under S 1983, any person may bring a claim against a government official who acts under color of state law to deprive that person of constitutional rights." Morley v. Walker, 175 F.3d 756, 759 (9th Cir. 1999). But qualified immunity shields public officials from liability" `insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Brewster v. Board of Educ., 149 F.3d 971, 977 (9th Cir. 1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity protects " `all but the plainly incompetent or those who knowingly violate the law .. . . [I]f officers of reasonable competence could disagree on th[e] issue [whether a chosen course of action is constitutional], immunity should be recognized.' " Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)) (alterations in original).
 
 
 13
 In order to determine whether the council defendants should receive qualified immunity, we must consider (1) whether the law governing the official's conduct was clearly established and (2) whether, given this clearly established standard, a reasonable official could believe that his or her conduct was lawful. See Ortega v. O'Connor, 146 F.3d 1149, 1154 (9th Cir. 1998).
 
 
 14
 Council defendants correctly argue that they are entitled to qualified immunity if the Biggs cannot demonstrate that the Constitutional right allegedly violated was not clearly established at the time of the council defendants' actions. See Moran, 147 F.3d at 844. In order to be clearly established:
 
 
 15
 "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."
 
 
 16
 Gilbrook v. City of Westminster, 177 F.3d 839, 865 (9th Cir. May 21, 1999) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation omitted)).
 
 B.
 
 17
 Here, we must decide whether the Biggs' conduct was constitutionally protected. In defining the Biggs' clearly established First Amendment rights, there is first a question as to whether we should apply the Branti political patronage (or political affiliation) cases, or the Pickering retaliation cases. Under Pickering, which governs adverse employment actions taken in response to protected employee speech, the court first considers whether the employee's speech is of public concern. If it is, the court conducts a balancing test that weighs the relative strength of the employee's and employer's interests. See Gilbrook, 177 F.3d at 866. Under Branti, the Supreme Court stated that as a general rule, government employees could not be terminated because of their political associations. See Branti, 445 U.S. at 517. Nevertheless, the Court carved out an exception, holding that "an employer may fire a public employee for purely political reasons if the employer can demonstrate that political considerations are `appropriate requirement[s] for the effective performance' of the job," because the employee would then occupy a policymaking or confidential position.[4] Fazio v. City & County of San Francisco, 125 F.3d 1328, 1332 (9th Cir. 1997) (quoting Branti, 445 U.S. at 518) (alteration in original). It is difficult to determine which line of cases to apply here because in many ways it was specific instances of the Biggs family's speech that revealed that their political associations were in conflict with those of the council defendants.
 
 
 18
 Second, there is a debate as to whether BBK, or at least Julie Biggs, is a public employee or an independent contractor of Redlands. This distinction is important, according to council defendants, because it was not clearly established in the Ninth Circuit in July of 1992 that an independent contractor could even assert a First Amendment section 1983 action for a politically-motivated dismissal by government officials.
 
 
 19
 We need not address these contentions, however, in light of our decision in Fazio, which made clear that an employee's status as a policymaking or confidential employee would be dispositive of any FirstAmendment retaliation claim. As we explained:
 
 
 20
 [A] public employee's claim that he or she was fired for exercising his or her First Amendment speech rights would generally be analyzed using the Pickering balancing test. If, however, a public employee is a policymaker, then the claim would fall under the rubric of Elrod [v. Burns , 427 U.S. 347 (1976) (plurality opinion)] and Branti. Thus, the crux of the issue in the case at hand is whether[the employee's] position was a policymaking one.
 
 
 21
 Id.
 
 
 22
 Similarly here, Julie Biggs' status as a policymaker is dispositive of the issues raised in this cross-appeal. If Julie Biggs were a policymaker, the council defendants would have been able to threaten to fire BBK because of the Biggs family's political activities, even under a Pickering analysis. See id. Julie Biggs' status as a policymaker would also obviate the need to examine whether she is best classified as a public employee or an independent contractor with respect to Redlands. Assuming that she was a public employee who was clearly able to assert a First Amendment section 1983 claim, the council defendants would still have been able to threaten to fire BBK for her political associations.
 
 C.
 
 23
 A review of the record leads to the inevitable conclusion that Julie Biggs did in fact occupy a policymaking position with respect to the City of Redlands. In deciding whether a person occupies a policymaking position, the court considers whether the individual has " `vague or broad responsibilities,' " in addition to the individual's" `relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders.' " Fazio, 125 F.3d at 1334 n.5 (quoting Hall v. Ford, 856 F.2d 255, 262 (D.C. Cir. 1988)). The central inquiry is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Id. at 1331 (internal quotation marks omitted).
 
 
 24
 Many cases have addressed the role of attorneys in city government, and almost all of them have found such attorneys to be policymakers subject to patronage discharges." `All circuit court decisions--and almost all other court decisions-involving attorneys in government service, other than public defenders, have held that Elrod/Branti do not protect these positions.' " Id. at 1333 (quoting Gordon v. County of Rockland, 110 F.3d 886, 890-91 (2d Cir. 1997) (internal quotation marks omitted)); accord Rendish v. City of Tacoma, 123 F.3d 1216, 1225 (9th Cir. 1997) ("There can be no doubt that loyalty and confidentiality are essential to the effective performance of the City Attorneys' office."); Williams v. City of River Rouge, 909 F.2d 151, 155 (6th Cir. 1990) ("[I]t is difficult to imagine a set of facts under which it would violate the first amendment to fire a city attorney for purely political reasons.").
 
 
 25
 In finding city attorneys, and assistant and deputy city attorneys, to be policymaking officials, the courts have relied on several factors. Cases have considered the fact that the position requires technical expertise, and often involves performing discretionary functions, advising city officials, representing the city, planning to implement city goals, drafting ordinances, negotiating contracts, and rendering legal opinions. See Bavaro v. Pataki, 130 F.3d 46, 50 (2d Cir. 1997) (technical expertise); Williams, 909 F.2d at 155 (considering the same factors as in Ness, and noting that the city attorney might have to represent the city in suits); Ness v. Marshall, 660 F.2d 517, 520, 522 (3d Cir. 1981) (noting that a policymaking attorney gave advice to city officials, and assisted in implementing city goals by drafting ordinances, negotiating contracts, and rendering legal opinions); Newcomb v. Brennan, 558 F.2d 825, 830 (7th Cir. 1977)(noting the discretionary role of the deputy city attorney, and the attorney's role in implementing policies of the city attorney's office as a whole).
 
 
 26
 The record establishes that Julie Biggs performed all of these tasks for the City of Redlands as an associate at BBK. Between January and July of 1989, Julie Biggs attended three Redlands City Council meetings in order to present reports on various legal issues, which reflected the results of her legal research and analysis. Julie Biggs also worked with Redlands staff, the city manager, and two city council members on a sludge processing plant through the first part of 1990, which required Julie Biggs to attend a closed city council meeting. Many of the issues Julie Biggs worked on for Redlands were "politically controversial," including questions of mobile home rent control and proposals to conduct elections by district. In working on these matters, it is undisputed that Julie Biggs participated in strategy sessions, rendered legal advice to Redlands, drafted City regulations and ordinances, had privileged meetings with Redlands' personnel, represented Redlands in meetings and negotiations, spoke to the press regarding Redlands at least once, and worked on an ordinance that would have limited utility services to City residents.
 
 
 27
 After May of 1990, Julie Biggs worked on ambulance transportation measures for Redlands, which required her to draw on her preexisting expertise, draft an internal legal memorandum, discuss issues with the Redlands Fire Chief, and prepare a letter. She also worked on self-insurance reserve requirements, business licenses taxes, and subdivision map act issues for Redlands, which involved drafting legal memoranda and discussing issues with the Redlands Finance Director and the Redlands Community Services Director. Finally, Julie Biggs admitted that she would attend departmental meetings at BBK where Redlands matters would be discussed, and that she was available to do whatever Redlands work BBK partners might assign to her.
 
 
 28
 Julie Biggs attempts to rebut this compelling evidence of her policymaking status by arguing (1) that policymaking activities should not be a factor for the Redlands city attorney because it is a nonpartisan position and (2) that she was not a policymaker because she only played a minor role on Redlands matters at BBK.[5]
 
 
 29
 But the fact that the city attorney, and even the city council, are nonpartisan positions in Redlands, does not affect the Branti policymaking analysis. Cases have explained that the Branti analysis turns on whether the employer has demonstrated that " `[speech] is an appropriate requirement for the effective performance of the public office involved.' " Feldman v. Ho, 171 F.3d 494, 496 (7th Cir. 1999), petition for cert. filed, (U.S. July 7, 1999) (No. 99-65) (quoting Waters v. Churchill, 511 U.S. 661, 671-75 (1994) (plurality opinion)) (alteration in original). Moreover, " `[p]olitical affiliation' is broader than `party membership' in that it includes `commonality of political purpose and support.' " Collins v. Voinovich, 150 F.3d 575, 577 (6th Cir. 1998) (quoting Williams, 909 F.3d at 153 n.4). Here, the Biggs family's role in seeking the recall of Redlands' mayor would have conflicted with Julie Biggs' work for Redlands. The fact that all of the parties involved held nonpartisan offices does not indicate that political affiliation, and the city council's need to trust its contract attorneys, was any less important.
 
 
 30
 Julie Biggs next argues that she was not a policymaker because her position was largely ministerial, and subject to review by the partners. She notes that she wasnot designated as Redlands' city attorney or deputy or assistant city attorney, and claims that she could not be a policymaker because she did not have to complete a financial disclosure statement that Redlands and the state of California required certain high level employees to file. But cases have indicated that the mere fact that an attorney was a subordinate does not imply that the attorney has no policymaking authority whatsoever. See Collins, 150 F.3d at 578 (noting that attorney who "performed the politically neutral and essentially technical job of providing legal advice upon request" could be discharged for political affiliation under Branti); Livas v. Petka, 711 F.2d 798, 801 (7th Cir. 1983) (recognizing that a subordinate attorney could be relied on by superiors to make decisions that could create policy). The Redlands financial disclosure requirements do not add anything to the analysis. They are geared towards individuals making decisions that may affect the financial interests of the city, but nothing indicates that these rules provide a definitive test of who is or is not a policymaking employee, especially in light of the above-cited cases. For example, confidential staff of the Redlands' Mayor are not listed as having to provide financial disclosure statements, despite the fact that they could well be subject to patronage dismissals under Branti. See Branti, 445 U.S. at 518.
 
 
 31
 Julie Biggs also emphasizes that her involvement in Redlands' matters at BBK diminished considerably after May of 1990, and suggests that this indicates that she was not a policymaker for the city at the time the council defendants threatened to fire BBK because of the Biggs family's activities. But Julie Biggs does not dispute that she "was available to do whatever work for Redlands that was, or might have been, assigned to her by [BBK] partners." Cases clearly hold that " `the relevant focus of analysis is the inherent duties of the position in question, not the work actually performed by the person who happens to occupy the office.' " Collins, 150 F.3d at 577 (quoting Williams, 909 F.2d at 154); see also Gordon, 110 F.3d at 891.
 
 
 32
 We need go no further. The council defendants were entitled to qualified immunity on Julie Biggs' First Amendment retaliation claim because Julie Biggs held a confidential, policymaking position with respect to the City of Redlands.[6] In making the comments that they did, the council defendants did not violate Julie Biggs' clearly established First Amendment rights.
 
 IV.
 
 33
 On direct appeal, the council defendants argue that they also were entitled to summary judgment on the First Amendment section 1983 claims asserted by Jerry and Holly Biggs because they were derivative of Julie Biggs' claim. At base, Jerry and Holly Biggs alleged that the council defendants attempted to silence their political activities by exerting pressure on Julie Biggs. They contend that their First Amendment political speech was chilled by their desire to protect Julie Biggs' position at BBK, and the salary that went with it,which benefitted the entire family. As a result, they argue, and the district court agreed, their section 1983 actions are separate from those of Julie Biggs.
 
 
 34
 We conclude, however, that Jerry and Holly Biggs' claims are derivative of those of Julie Biggs. This result becomes apparent when one examines the requirements for standing in Article III courts.[7] As we have recognized:
 
 
 35
 The "irreducible constitutional minimum" for standing in an Article III court requires: "(1) that the plaintiff have suffered an `injury in fact' [--] an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of--the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."
 
 
 36
 Presidio Golf Club v. National Park Service, 155 F.3d 1153, 1157 (9th Cir. 1998) (quoting Bennett v. Spear , 520 U.S. 154, 167 (1997)).
 
 
 37
 Here, the only injury in fact that Jerry and Holly Biggs' situation presents is the loss of Julie Biggs' salary that she received while an associate at BBK. We agree with the Tenth Circuit that this type of injury is sufficiently substantial to permit Jerry and Holly Biggs to raise only the same claims asserted by Julie Biggs. See Horstkoetter v. Department of Public Safety, 159 F.3d 1265, 1278-79 (10th Cir. 1998). In Horstkoetter, wives of Oklahoma Highway Patrol troopers, along with their husbands, challenged a regulation that prohibited troopers from displaying campaign signs at their residences. See id. at 1269. The wives had claimed, under the injury in fact prong of the standing analysis, that they had been injured under the First Amendment because they had to remove the political signs from their homes in order to save their husbands' jobs. The court determined that the wives could "raise the same claims as their husbands, and do not have standing to raise any separate claims of their own." Id. at 1279. The court reasoned that the Highway Patrol's policy could apply only to the troopers and not their wives, and that, "[u]nder the terms of the policy itself, there was never any possibility of disciplinary action against the wives directly." Id. The court noted that the Highway Patrol could not have fined, imposed criminal sanctions against, or disciplined the wives, but only terminate the troopers themselves. See id. The court determined that the threat of a loss of income that would result from their husbands' termination did constitute an injury, but that this injury was only significant "enough to confer standing to raise, derivatively, the same claims as their husbands raised." Id.
 
 
 38
 The similarities between Horstkoetter and the instant case are substantial. Here, Julie Biggs' spouse and daughter had their First Amendment rights restrained out of fear that Julie Biggs would lose her position at BBK. The sanctions threatened by the council defendants would affect only Julie Biggs directly, not Jerry or Holly Biggs. As in Horstkoetter, the only damage to Jerry and Holly Biggs was the indirect harm that would result from the loss of Julie Biggs' income. Although the loss of Julie Biggs' salary is not insubstantial, we hold that it is only sufficient to confer standing on Jerry and Holly Biggs to assert the same claims brought by Julie Biggs.
 
 
 39
 By adopting the Horstkoetter approach, we also address concerns raised by the Fourth Circuit in English v. Powell, 592 F.2d 727, 729-30 (4th Cir. 1979). In English , the court held that a wife who alleged that her husband had lost his job because of her exercise of her First Amendment rights did not have standing to sue her husband's county employer. The court reasoned that her alleged injuries, which included her husband's decreased salary from a demotion, "are too indirect and speculative to support [the wife's] standing as plaintiff in a lawsuit filed to challenge the propriety of her husband's demotion." Id. at 730. By limiting the claims that Jerry and Holly Biggs may assert to those raised by Julie Biggs, any speculative aspect of their injury is eliminated.
 
 
 40
 As a result, because Jerry and Holly Biggs' claims are derivative of those of Julie Biggs, their claims are subject to the same standards as Julie Biggs' claims. See Horstkoetter, 159 F.3d at 1279-80. Because council defendants are entitled to summary judgment on the basis of qualified immunity on Julie Biggs' claims, the council defendants also are entitled to qualified immunity on Jerry and Holly Biggs' claims. It was not clearly established that council defendants could not take the action against Julie Biggs that they did. It was even less clear that the council defendants could not take the action against Julie that they did because of Jerry and Holly Biggs' activities.
 
 V.
 
 41
 For the foregoing reasons, we affirm the district court's grant of summary judgment to the council defendants on Julie Biggs' section 1983 action. We reverse the district court's decision denying the council defendants summary judgment on Jerry and Holly Biggs' section 1983 claims, and remand with instructions to grant the council defendants' motion for summary judgment.
 
 
 42
 No. 97-55233 AFFIRMED.
 
 
 43
 No. 97-55573 REVERSED.
 
 
 44
 Costs to Foster and Larson in both cases.
 
 
 
 Notes:
 
 
 [1]
 The Honorable James Ware, United States District Judge for the Northern District of California, sitting by designation.
 
 
 [2]
 BBK was also named in the complaint, but the Biggs have since settled their claims against the law firm.
 
 
 [3]
 The district court also granted council defendants summary judgment on Julie Biggs' Fifth Amendment claim. Julie Biggs does not challenge this ruling on appeal.
 
 
 [4]
 The terms "policymaker" and "policymaking" are used throughout much of this opinion as a shorthand for both policymaking and confidential roles. As the Supreme Court noted, "the ultimate inquiry is not whether the label `policymaker' or `confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." Branti , 445 U.S. at 518.
 
 
 [5]
 Julie Biggs also relies on our decisions in Erickson v. Pierce County, 960 F.2d 801 (9th Cir. 1992); Finkelstein v. Bergna, 881 F.2d 702 (9th Cir. 1989), opinion withdrawn, 924 F.2d 1449 (9th Cir. 1991); and Johnston v. Koppes, 850 F.2d 594 (9th Cir. 1988). None of these decisions is applicable here, however, because, among other reasons, they did not consider whether the employee in question could have been classified as a policymaker under Branti.
 
 
 [6]
 We note that the result we reach today is consistent with decisions from several circuits that have concluded that individuals may be removed from their positions because of their, and their families', political activities. See, e.g., Soderstrum v. Town of Grand Isle, 925 F.2d 135, 136, 14041 (5th Cir. 1991) (holding that it was permissible to not reappoint a secretary who was the wife of the outgoing police chief's nephew because the outgoing police chief was a political opponent of the incoming police chief); Williams, 909 F.2d at 155; Clark v. Brown, 861 F.2d 66, 68 (4th Cir. 1988) ("[T]here is some authority for the proposition that dismissal of an employee because of a relative's political activities does not violate the employee's first amendment rights."); Shondel v. McDermott, 775 F.2d 859, 863-65 (7th Cir. 1985) (holding that it was permissible to fire a non-policymaking employee "because her stepfather [who had been a policymaking employee] was a political opponent of the new mayor"); Soderbeck v. Burnett County, 752 F.2d 285, 288 (7th Cir. 1985) (noting that, in theory, a sheriff's confidential secretary, who was the wife of a political opponent of the sheriff, could be terminated for that reason).
 
 
 [7]
 We are required to raise issues of standing sua sponte, if necessary. See San Francisco Drydock, Inc. v. Dalton, 131 F.3d 776, 778 (9th Cir. 1997) ("The plaintiffs assumed that they had standing to bring this suit; the defendants did not deny it; and the district court accepted the case. It is, however, our obligation to be sure that standing exists and to raise, sua sponte if need be, any deficiency.").