Jeff BARDZIK, Plaintiff,

v.

COUNTY OF ORANGE,
et al, Defendants.

Case No. SACV 07–141 JVS(RNBx).

United States District Court,
C.D. California.

March 11, 2009.

Christy Virginia Keeny, Dan Stormer, Joshua Piovia–Scott, Randall R. Renick Hadsell Stormer Keeny Richardson and Renick LLP, Pasadena, CA, for Plaintiff.

Alexandru Dan Mihai, S. Frank Harrell, Shannon Lin Gustafson, Lynberg & Watkins PC, Orange, CA, Christopher Daniel Whyte, Jackson Lewis LLP, Newport Beach, CA, Norman J. Watkins, Lynberg & Watkins, Los Angeles, CA, for Defendants.

## FINAL ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION

JAMES V. SELNA, District Judge.

Defendants County of Orange, *et al.* (collectively, the "Orange County Defendants") move for summary judgment or summary adjudication against Plaintiff Jeff Bardzik ("Bardzik"). Bardzik opposes the motion. The motion is denied.

### I. *BACKGROUND*

Michael Carona ("Carona") was elected Orange County Sheriff in 1998. In November 2003, Carona asked Lieutenant Bardzik to serve as Reserve Division Commander. During the 2006 elections, Bardzik supported a challenger, Bill Hunt, for Sheriff of the Orange County Sheriff's Department. Hunt lost to the incumbent, Corona. Bardzik contends that, in retaliation for his support of Hunt, the Orange County Defendants rescinded a promised

promotion, denied pay raises, prevented further promotion, and transferred Bardzik to a less prestigious position. Bardzik also alleges that the retaliation included the fabrication of wrongdoing by Bardzik resulting in Internal Affairs investigations. Bardzik's Second Amended Complaint ("SAC") alleges violations of his free speech rights pursuant to 42 U.S.C. § 1983.

## II. *LEGAL STANDARD*

Summary judgment is appropriate only where the record, read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Material facts are those necessary to the proof or defense of a claim, and are determined by reference to substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. "However, if the nonmoving party bears the burden of proof on an issue at trial, the moving party need not produce affirmative evidence of an absence of fact to satisfy its burden." *In re Brazier Forest Prod., Inc.*, 921 F.2d 221, 223 (9th Cir.1990). Rather, it "may simply point to the absence of evidence to support the nonmoving party's case." *Id.* If and only if the moving party meets its burden, then the non-moving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. If the nonmoving party meets this burden, then the motion will be denied. *Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1103 (9th Cir.2000).

## III. *DISCUSSION*

The Orange County Defendants make three primary arguments in support of this motion for summary judgment or summary adjudication. First, they argue that Bardzik's First Amendment claims are barred by the principles set forth in *Elrod* and *Branti.* Mot p. 12; *see generally Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976): *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Second, they contend that Bardzik's claims are barred by the *Pickering* balancing test. Mot. p. 18; *see generally Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Third, they argue that Carona is shielded by the doctrine of qualified immunity. (Mot. p. 20.) This Court addresses each argument in turn.

### A. The *Elrod–Branti* Rule

The Orange County Defendants first argue that Bardzik's First Amendment claims are barred by the principles set forth in *Elrod* and *Branti.* Mot. p. 12; *see generally Elrod*, 427 U.S. at 347, 96 S.Ct. 2673; *Branti*, 445 U.S. at 507, 100 S.Ct. 1287. This argument raises two issues: (1) Was Bardzik a policymaker subject to partisan dismissal; and (2) even if Bardzik was such a policymaker, did the Orange County Defendants' alleged retaliation serve a vital and legitimate government interest?

### 1. Was Bardzik a Policymaker Subject to Partisan Dismissal?

In 1976, in *Elrod,* the U.S. Supreme Court declared patronage dismissals unconstitutional. *Elrod,* 427 U.S. at 359, 96 S.Ct. 2673. The Court reasoned that such dismissals limit political belief and association, and therefore violate the First and Fourteenth Amendments. *Id.* at 355, 360, 96 S.Ct. 2673. In *Elrod,* four non-civil service employees of a sheriff's department were fired by the new sheriff because they were not affiliated with or sponsored by the political party of the newly elected Sheriff.[1] *Id.* at 350, 96 S.Ct. 2673. The Court found that the employees stated a valid claim for deprivation of constitutional rights. *Id.* at 374, 96 S.Ct. 2673. The Court recognized a narrow exception to the unconstitutionality of patronage dismissals, however, for "policymaking positions" where "the employee acts as an adviser or formulates plans for the implementation of broad goals" (the "policymaker exception"). *Id.* at 350–51, 96 S.Ct. 2673. "The Court allowed patronage dismissals of those holding policymaking positions, reasoning that this exception would, in part, advance the important government goal of assuring 'the implementation of policies of [a] new administration, policies presumably sanctioned by the electorate.'" *Jenkins v. Medford,* 119 F.3d 1156, 1160–61 (4th Cir.1997) (citation omitted).

The Supreme Court refined the policymaking exception four years later, in *Branti. See generally Branti,* 445 U.S. at 507, 100 S.Ct. 1287; *DiRuzza v. County of Tehama,* 206 F.3d 1304, 1308 (9th Cir. 2000) (citation omitted). In *Branti,* a newly appointed Democratic public defender gave notices of termination to Republican assistant public defenders in the office. *Branti,* 445 U.S. at 508–09, 100 S.Ct. 1287.

The Court held that the terminations were unconstitutional because an assistant public defender does not occupy a position where party affiliation is an appropriate requirement for the effective performance of the public office. Rather, [t]he primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State, and whatever policymaking occurs in the public defender's office must relate to the needs of individual clients and not to any partisan political interests.

*DiRuzza,* 206 F.3d at 1308–09 (citing *Branti,* 445 U.S. at 518–19, 100 S.Ct. 1287).

■ The Orange County Defendants argue that this Court should adopt the reasoning in cases interpreting the *Elrod–Branti* Rule from other circuits that have held that deputy sheriffs are subject to patronage dismissals. (Mot. pp. 16–17.) This Court recognizes that several other circuits have upheld patronage dismissals of deputy sheriffs. For example, in *Jenkins,* 119 F.3d at 1164, the Fourth Circuit held that under North Carolina law, deputy sheriffs are subject to patronage dismissals. In *Upton v. Thompson,* 930 F.2d 1209, 1218 (7th Cir.1991), the Seventh Circuit found that "deputy sheriffs operate with a sufficient level of autonomy and discretionary authority to justify a sheriff's use of political considerations when determining who will serve as deputies." In *Terry v. Cook,* 866 F.2d 373, 377 (11th Cir.1989), the Eleventh Circuit found that "loyalty to the individual sheriff and the goals and policies he seeks to implement through his office is an appropriate re-

---

1. One employee was the Chief Deputy of the Process Division, another a bailiff, and the third a process server; the Court did not disclose the position of the fourth employee. *Elrod,* 427 U.S. at 350, 96 S.Ct. 2673. The employees were Republicans while the newly elected sheriff was a Democrat. *Id.*

quirement" for deputy sheriffs and allowed the sheriff to refuse to rehire any deputies from the prior administration.

This Court is bound, however, by the Ninth Circuit. In *DiRuzza*, 206 F.3d at 1304, the Ninth Circuit explicitly declined to follow *Jenkins, Upton,* and *Cook.* The *DiRuzza* court stated that "[w]e are willing to assume arguendo that the[ ] holdings [in *Jenkins, Upton,* and *Cook* ] are correct, based on the different nature of the job performed by deputy sheriffs in these circuits and these states." *Id.* at 1309. But, the court explained, a per se rule concerning deputy sheriffs is not appropriate in the Ninth Circuit or in California. *Id.* The court found that "[t]he title 'deputy sheriff' or 'sheriff's deputy' is [ ] not a clear job category with consistent responsibilities in California. Any categorization based upon job title alone obscures rather than clarifies the nature of the duties actually performed and the constitutional rights at issue." [2] *Id.* Therefore, this Court must examine Bardzik's specific duties to determine whether party affiliation, or more precisely loyalty to the Sheriff in the electoral process, is an appropriate requirement for the effective performance of his position.

*DiRuzza* is also instructive because it arises out of similar facts and issues. In *DiRuzza*, a former deputy sheriff, DiRuzza, sued the county, sheriff, and undersheriff pursuant to 42 U.S.C. §§ 1983, 1985. *Id.* at 1306–07. DiRuzza alleged that she was retaliated against because she supported the incumbent sheriff in his campaign for reelection. *Id.* at 1306. The incumbent sheriff lost to Sheriff Robert Heard, a defendant in the case. *Id.* The district court granted summary judgment in favor of the defendants, holding that they were allowed to retaliate against Di-

Ruzza for her political speech because she was a policymaker and because political loyalty was an appropriate requirement for her job. *Id.* The Ninth Circuit reversed the decision of the district court, remanding for a determination of whether DiRuzza's actual duties were those of a policymaker. *Id.*

The court found that the "key inquiry is whether DiRuzza held a policymaking position where political affiliation was a 'reasonably appropriate requirement' for the job." *Id.* at 1308. The court then set forth several factors to consider when deciding whether political affiliation may be considered a job requirement. *Id.* at 1310 (citing *Fazio v. City and County of San Francisco*, 125 F.3d 1328, 1334 n. 5 (9th Cir.1997)). These factors include "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." *Id.; Fazio,* 125 F.3d at 1334 n. 5.

The court applied these factors, noting that DiRuzza drafted a "policy manual" and also spent three months assisting a Lieutenant in a suit involving jail conditions. *DiRuzza*, 206 F.3d at 1311. "[T]he drafting consisted of revising an old manual of jail procedures, such as procedures for handling inmates' mail, in order to comply with court-ordered requirements." *Id.* Nevertheless, the court found that the defendants were not entitled to summary judgment because there were material facts in dispute regarding the duties actually performed by DiRuzza and whether those duties made her a policymaker subject to partisan dismissal. *Id.* at 1310,

---

**2.** Similarly, in *Heggen v. Lee*, 284 F.3d 675, 685–86 (6th Cir.2002), the court found that only a case-by-case analysis of the position held by and specific duties of deputy sheriffs comports with *Branti*.

1312. The court found that "on the current state of the record, there is little to support a conclusion that DiRuzza is a policymaker." *Id.* at 1311. The court explained that the defendants had the burden to show that DiRuzza was a policymaker. *Id.*

Similarly, in *Thomas v. Carpenter*, 881 F.2d 828, 828–29 (9th Cir.1989), the Ninth Circuit reversed a lower court's determination to dismiss an action brought by a sheriff's Lieutenant who brought a civil rights action alleging that the sheriff retaliated against him for challenging the sheriff in an election. Thomas was employed as a Lieutenant in the Santa Barbara Sheriff's Department. *Id.* The Department's policy and discipline manual defined a Lieutenant as a "subexecutive" whose duty was to "carry out department policies and administer and supervise the work of various subdivisions." *Id.* The court found that Thomas was not responsible for developing departmental policy, and therefore he could only "recommend policy changes through the designated chain of command." *Id.* at 829.

This was despite the fact that Thomas "had attended over 100 departmental staff meetings in the absence of his Division Commander, attended departmental policy manual revision meetings in conjunction with other Lieutenants in the department, and participated as an evaluator in training exercises for the department's high risk entry team." *Id.* The court found that the significance of Thomas' participation in policy manual revision meetings was unclear. *Id.* at 832. The court concluded that the defendant could not show, based on the complaint, that Thomas' political loyalty was essential to the effective performance of the tasks removed from his list of responsibilities. *Id.*

This Court now considers Bardzik's duties and the factors set forth in *DiRuzza* and *Fazio* to assess whether Bardzik held a policymaking position where political loyalty was a reasonably appropriate requirement for the job. *See DiRuzza,* 206 F.3d at 1310; *Fazio,* 125 F.3d at 1334 n. 5. The Orange County Defendants argue that Bardzik had vague, broad job responsibilities as Commander of the Reserves. (Mot. p. 14.) Indeed, in November of 2003, Carona asked Bardzik "to take command of the Reserve Division, clean it up and bring it back to respectability." (SAC ¶ 9; Bardzik Depo. 32:15–21.) Carona also told Bardzik to "get rid of . . . dead wood." (Bardzik Depo. 48:2–3.) The Court recognizes that this language is somewhat vague and broadly worded.

On the other hand, Bardzik testified that he "interacted with just about every division in the entire department because that's where the reserves could work . . . In a nutshell, [my responsibilities included] allocating resources out to whoever needed them while making the decision what to keep in case we need it for something else . . ." (*Id.* at 141:3–5, 22–25.) Drawing all justifiable inferences in favor of Bardzik as is appropriate on a motion for summary judgment, the Court cannot say based on the current record that allocating reserves constitutes vague and broad responsibility. For example, Bardzik's supervisors may have created the general framework for the program, *i.e.,* they may have decided how many reserves there would be and the types of assignments the reserves would be given. Merely executing the program by allocating volunteers to vacant spots on a daily basis would likely not constitute vague and broad responsibility.[3] The Orange County Defendants also point out that Bardzik stated that he was "in effect running the Reserves." (Mot. p. 14;

3. The Court also notes that interacting with the different department divisions does not necessarily entail vague or broad responsibility or policymaking.

Bardzik Depo. at 114:2–3.) However, this says nothing about what running or managing the Reserves entailed.

In addition, the Orange County Defendants contend that Bardzik had substantial power to control others. (Mot. p. 15.) Bardzik testified that he was responsible for the "overall supervision of . . . many volunteers and reserves throughout the sheriff's department and where they work" as well as "supervising two sergeants under [him]." (Bardzik Depo. 32:17–21.) Bardzik also dealt with personnel issues involving the Reserves. (*Id.* at 141:3–11.) He explained that "[y]ou can imagine with a force that large, the personnel issues with 600 members . . . it wouldn't be unusual to get calls weekends and nights. So I would deal with those on a regular basis." (*Id.*) Again, drawing all justifiable inferences in favor of Bardzik, on the current record, the Court does not have specific information about what the personnel issues entailed and whether Bardzik had broad, policymaking authority in responding to those issues. It does not necessarily indicate broad power to control others.

The Orange County Defendants further point out that Bardzik had contact with elected officials including Carona. (Mot. p. 16.) Bardzik testified that he met face-to-face with Carona three or four times a month during the first year and "perhaps a few times a week" depending on "what's going on" in later years. (Bardzik Depo. 111:17–24.) This Court recognizes that this factor weighs somewhat in favor of the Orange County Defendants' argument.[4]

However, Lieutenants in the Department are separated from the Sheriff by the ranks of Captain, Assistant Sheriff, and Undersheriff.[5] (Bardzik's Statement of Facts ("SOF") ¶¶ 3, 156.) In addition, Bardzik earned approximately $116,000 in 2005 and 2006, and $126,000 in 2007. (*Id.* at ¶ 155.) In contrast, Assistant Sheriffs in the Orange County Sheriff's Department earned as much as $260,000 during this time period. (*Id.*) This demonstrates a significant pay differential between Lieutenants and Assistant Sheriffs. These factors weigh in favor of Bardzik because they suggest that he was not among the top officials in the Department.

Moreover, Bardzik argues that he was not a policymaker because: (1) the Command Staff, comprised of the Sheriff, the Undersheriff, and Assistant Sheriffs, retained ultimate policymaking authority over the Reserve Division (Bardzik Decl. ¶ 8); (2) Bardzik's chain of command was never directly to the Sheriff[6] (*id.* at ¶ 4);

---

4. In their Reply brief, the Orange County Defendants point to Jerry Harper's deposition testimony. (Reply p. 2, Ex. A, Harper Depo. 69:1–19.) In response to being asked whether Carona was entitled to fill Bardzik's position with someone he felt professionally compatible with, Harper testified, "[i]n general, I would say yes." (Harper Depo. 67:1–19.) Harper is not, however, in a position to come to the legal conclusion that Bardzik held a position where party affiliation or political loyalty was an appropriate requirement for the job. In addition, the Orange County Defendants argue that Bardzik impliedly admitted that he was a policymaker because he did not expressly state that he was not a policymaker in his deposition. (Reply p. 7.) The Court is not persuaded by this argument.

5. There are approximately 60 Lieutenants and 15 Captains in the Orange County Sheriff's Department. (SOF ¶¶ 153–54.)

6. The Orange County Defendants point out that Bardzik contradicted his own statement in his application for Captain. (Reply p. 5, Ex. C.) In his application, Bardzik stated that "[m]y chain of command was directly with the Sheriff." (*Id.*) Even assuming that Bardzik's chain of command was directly to the Sheriff for a certain period of time, the Court finds that Bardzik has nevertheless provided sufficient other evidence that he was not policymaker to demonstrate a genuine issue of material fact.

(3) the Division budget was controlled by the Division's Assistant Sheriff (*id.* at ¶¶ 9–10); (4) Bardzik was not authorized to transfer or allocate funds from the budget (*id.* at ¶ 10); (5) Bardzik was only permitted to approve expenditures of less than $300 dollars (*id.* at ¶ 9); (6) Bardzik only supervised five full-time, paid employees, three of whom were clerical staff; all of the other individuals in the Reserve Division were part-time volunteers (*id.* at ¶ 16); (7) Bardzik did not have the final authority for the performance evaluations of the employees he supervised or the authority to decide which volunteers would be promoted (*id.* at ¶¶ 6–8); (8) Bardzik was not responsible for training the reserves (*id.* at ¶ 12); and (9) Bardzik was not responsible for determining the reserve staffing levels. (*Id.* at ¶ 13.) (Opp. pp. 13–14.)

After carefully reviewing the above evidence in the light most favorable to Bardzik and in light of Ninth Circuit case law, the Court finds there are material facts in dispute as to Bardzik's duties and whether his duties made him a policymaker subject to partisan dismissal. Although the Orange County Defendants have presented some evidence to suggest that Bardzik was a policymaker, the Defendants have not presented sufficient evidence for the Court to find as a matter of law that Bardzik held a policymaking position where political affiliation was a reasonably appropriate requirement for the job. This is particularly true given that the Court must draw all justifiable inferences in favor of Bardzik for purposes of this motion, and given that the Defendants have the burden at trial to show that Bardzik was a policymaker.[7] *See DiRuzza,* 206 F.3d at 1311.

## 2. Did the Orange County Defendants' Alleged Retaliation Serve a Vital and Legitimate Government Interest?

■ This Court finds that even if Bardzik was a policymaker subject to partisan dismissal, there are nevertheless material issues of fact as to whether certain actions taken against Bardzik served a vital and legitimate government interest.[8]

**7.** The Orange County Defendants also argue that, as to Bardzik's complaints that he was denied promotion to Captain and prevented from becoming Chief of Police, the issue is whether Bardzik would have been a policymaker in those positions. (Reply p. 12.) This Court agrees. In *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 74, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (emphasis supplied), the Supreme Court explained that "[a] government's interest in securing employees who will loyally implement its policies can be adequately served by *choosing* or dismissing certain high-level employees on the basis of their political views." Thus, loyalty and political views may be a basis for choosing certain high-level, policymaking employees as well as dismissing them.

Assuming Captain and Chief of Police are policymaking positions subject to partisan dismissal, it would not make sense to require Carona to promote Bardzik to one of these positions and then permit Carona to dismiss him for political reasons. However, although the Court recognizes that Captain and Chief of Police are more likely policymaking posi-

tions than Lieutenant, the Court cannot make such a determination on this motion for summary judgment. The selection process distinguishes the positions from similar positions in cities which independently appoint their own Chief of Police and Captains. In addition, the current record says very little about the positions of Captain and Chief of Police. The Orange County Defendants included only two paragraphs on this issue in their Reply Brief, not giving Bardzik a chance to respond. (*See* Reply p. 12.) Moreover, as the Court discusses below, even if all the positions at issue are policymaking positions, there is an issue of fact as to whether the alleged retaliation was based on a vital and legitimate government interest.

**8.** At oral argument, the Orange County Defendants argued that the question of whether Bardzik is a policymaker is dispositive of the case and the Court need not inquire into whether the alleged retaliation served a vital or legitimate government interest. In support of this argument, the Orange County Defendants pointed to *Biggs v. Best, Best & Krieger,*

There is some suggestion that the alleged retaliation exceeded the scope of the policymaker exception. In *Elrod,* the Supreme Court stated that "if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is *least restrictive* of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Elrod,* 427 U.S. at 363, 96 S.Ct. 2673 (emphasis supplied).

Here, Bardzik alleges that Carona asked his friend John Hensley to "tell Bardzik [that Bardzik] should resign." (Compl. ¶ 19.) Bardzik also testified that he confronted Carona about this message during a later face-to-face meeting. (Bardzik Depo. 99:11–14.) Bardzik testified that he asked Carona why he sent the message that Bardzik should *resign from law enforcement.* (*Id.*) Carona replied that it was because of his support for Hunt in the election. (*Id.*) Clearly, a request that Bardzik resign from his profession as a whole is not in keeping with the purpose and scope of the policymaker exception, which is intended to allow government officials to work with supportive and loyal policymakers, not to pressure a qualified employee to leave his line of work altogether.

Furthermore, there is some suggestion that the Orange County Defendants may have engaged in unnecessary harassment of Bardzik. In *DiRuzza,* the Ninth Circuit quoted a Seventh Circuit case which provides that although "a deputy sheriff may be terminated for political reasons, a deputy may not be retained and then subjected to a campaign of retaliatory harassment." *DiRuzza,* 206 F.3d at 1309 (citing *Wallace,* 67 F.3d at 664). Bardzik alleges that, prior to his transfer to out of the Reserve Division, the Orange County Defendants fabricated wrongdoing by Bardzik resulting in two unfounded Internal Affairs investigations. (Compl. ¶¶ 25–26; Opp. pp. 11–12.) Bardzik further asserts that the Orange County Defendants kept the investigations open well beyond the statutory one-year period in which they must be completed in violation of both California law and the Department's own rules. (Kiddy Depo. 127:15–20, 139:16–140:3, Ex. 60.) The Department eventually found that both investigations were "not sustained." (Piovia–Scott Decl., Ex. 44–45.) Presuming that the investigations were unfounded and unnecessarily lengthy, the Court finds that this is evidence of improper harassment and cannot be justified under the policymaker exception.

Finally, although the Court need not fully examine the issue at this time, there is one significant difference between the present case and *Elrod, Branti,* and *Di-*

189 F.3d 989 (9th Cir.1999). In *Biggs,* the Ninth Circuit stated that it made clear in *Fazio* "that an employee's status as a policymaking or confidential employee would be dispositive of any First Amendment retaliation claim." *Id.* at 994–95. However, read in context, the Ninth Circuit was explaining that the issue of whether the plaintiff was a policymaker mooted the issue of whether the plaintiff could assert a First Amendment § 1983 case for a politically-motivated dismissal. *See id.* The Orange County Defendants interpret the language to mean that

once a court determines that an employee is a policymaker, the court should necessarily find against that employee in any First Amendment retaliation action. This reading is too broad. Courts have found that even if a policymaking employee may be terminated for political reasons, that employee may not be retained and then subjected to a campaign of retaliatory harassment. *DiRuzza,* 206 F.3d at 1309 (citing *Wallace v. Benware,* 67 F.3d 655, 664 (7th Cir.1995)). Thus, a determination that an employee is a policymaker cannot be the absolute end of the inquiry in every case.

*Ruzza.* In *Elrod* and *Branti,* the employees were terminated or threatened with termination because they were not affiliated with the political party of the elected leadership. *See Elrod,* 427 U.S. at 347, 96 S.Ct. 2673; *Branti,* 445 U.S. at 507, 100 S.Ct. 1287. In *DiRuzza,* the issue was whether it was proper to fire the employee because she did not support the newly elected sheriff. *See DiRuzza,* 206 F.3d at 1306. In the present case, there is some suggestion that Bardzik was retaliated against, not only because he supported Hunt in the election, but also as part of an attempt by Carona to cover up and perpetuate corrupt and illegal activity.

■ The underlying purpose of the *Elrod–Branti* policymaker exception is to protect a legitimate *government interest of vital importance. Elrod,* 427 U.S. at 362–63, 96 S.Ct. 2673. In *Elrod,* the Supreme Court stated that "if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some *vital government end* by a means that is least restrictive of freedom of belief and association in achieving that end, and *the benefit gained must outweigh the loss of constitutionally protected rights." Id.* at 363, 96 S.Ct. 2673 (emphases supplied). The Court further stated that "[i]f the State has open to it a less drastic way of satisfying *its legitimate interests,* it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Id.* (emphasis supplied). Therefore, the government interest must be both vital and legitimate.

This Court sees no legitimate government interest in the covering up and perpetuation of corruption. The following hypothetical illustrates the general point. Assume that an elected official embezzled $1,000 a month from his government employer. Assume that a policymaker within

the *Elrod–Branti* policymaker exception had palpable proof of the embezzlement and went public with the information at the next election. There is at least a substantial question whether any government purpose would be served by condoning the dismissal of a whistleblower who could prove his claim. Moreover, allowing the corrupt official to retaliate against the whistleblower may serve to encourage the whistleblower to remain silent or to support the illegal or corrupt activity.

In addition, in *Johnson v. Multnomah County, Or.,* 48 F.3d 420, 427 (9th Cir. 1995) (emphasis supplied) (internal quotations omitted), the Ninth Circuit stated:

> [A] County *does not have a legitimate interest in covering up mismanagement or corruption* and cannot justify retaliation against whistleblowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure. Nor are the County's legitimate interests injured if [defendant] was undermined by truthful statements exposing his own wrongdoing. If we were to hold otherwise, [s]ome of the most important public employee speech-exposing government corruption, wrongdoing, or incompetence-would be left outside the First Amendment's aegis.

Although the *Johnson* court was not discussing a case involving the policymaker exception, the court clearly stated that the government "does not have a legitimate interest in covering up mismanagement or corruption." *Id.* To this Court's knowledge, the Ninth Circuit has not specifically addressed the question of whether the policymaker exception would apply to a situation involving the cover-up of corruption or illegality. However, when read together, *Elrod* and *Johnson* suggest that the policymaker exception only applies to legitimate government interests and that covering up corruption is not a legitimate

government interest. Such a cover up would only benefit individual corrupt officials.

Therefore, to the extent that the Orange County Defendants retaliated against Bardzik because he threatened to uncover corruption in the Department, the Court finds that there is at a minimum a material issue of fact as to whether the retaliation served a vital, legitimate government interest and thus does not fall within the policymaker exception of *Elrod* and *Branti*. Whether the Defendants retaliated for illegitimate reasons is a question of fact that cannot be resolved on a motion for summary judgment.

Bardzik offers evidence suggesting that the alleged retaliation may have arisen out of and been based, at least in part, on an improper cover-up of corrupt or illegal activity. First, neither party in the present action disputes that Bardzik has been vocal in expressing his view that Carona engaged in unethical behavior as Sheriff. Bardzik testified that he "thought [Carona] did not possess the principles and traits that ... would best serve the organization" and that this conclusion was "based on decisions [Carona] made, some of which [Bardzik] viewed as not ethical." (Bardzik Depo. 60:17–61:1.)

Second, Bardzik claims that he directly confronted Carona during a meeting in August 2005, providing Carona with several specific examples of why Bardzik was supporting Hunt in the election. (*Id.* at 97:15–18, 101:1–8.) Bardzik allegedly explained to Carona that he believed Carona was issuing law enforcement badges in violation of the law to people who did not deserve them. (*Id.* at 101:4–8.) Bardzik also allegedly told Carona that Bardzik had wanted to take the badges away for legal reasons despite the fact that Bardzik believed Carona had issued the badges to

people who were politically important to Carona. (*Id.* at 104:22–105:1.) Carona then allegedly told Bardzik to "leave it alone." (*Id.*) Bardzik also claims that he told Carona that Carona should not have bestowed the title of assistant sheriff on George Jaramillo ("Jaramillo") and Don Haidl ("Haidl"). (*Id.* at 101:1–3.) Bardzik further states that he accused Carona of refusing to fire people who were doing damage to the organization, referring to Jaramillo and Haidl. (*Id.* at 106:21–107:3.)

This evidence is sufficient to raise a material issue as to whether the retaliation against Bardzik was motivated at least in part by a desire to further a scheme of corrupt activities. Although the Court does not conclusively answer this question at this time, it is therefore at least possible that the *Elrod–Branti* policymaker exception would not apply in this case.

For all of the above reasons, this Court denies the Orange County Defendants' request for summary judgment on the basis of the *Elrod–Branti* Rule.

### B. The *Pickering* Balancing Test

■ The Orange County Defendants further argue that Bardzik's claims are barred by the *Pickering* balancing test. (Mot. p. 18.) This Court disagrees.

The Ninth Circuit has explained that courts should apply the *Pickering* balancing test "[w]hen analyzing claims by government employees who are asserting that they were fired because they exercised their First Amendment rights." *Fazio*, 125 F.3d at 1331 (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731).[9]

> [T]he trial court must balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency

---

9. The policymaker exception is an exception
to this general rule. *Fazio*, 125 F.3d at 1331.

of the public services it performs through its employees. In performing this analysis, the court should inquire into such matters as whether the speech: (i) impairs discipline or control by superiors, (ii) disrupts co-worker relations, (iii) erodes a close working relationship premised on personal loyalty and confidentiality, (iv) interferes with the speaker's performance of her or his duties, or (v) obstructs the routine operations of the office.

*Id.* (quoting *Hyland v. Wonder,* 972 F.2d 1129, 1139 (9th Cir.1992)) (internal quotations omitted).

The Orange County Defendants do not dispute that Bardzik's support of Hunt in the election was a matter of public concern. (*See* Mot. p. 18.) Clearly, statements in support of a candidate running for political office and statements questioning the ethics of the incumbent are matters of public concern.

The Orange County Defendants argue, however, that Bardzik's statements questioning Carona's ethics and supporting Hunt caused a significant disruption in the Sheriff's Department. (*Id.* at 19.) Therefore, they contend, the interest of the state in promoting the efficiency of public services outweighs Bardzik's interests in commenting on the election. (*Id.*)

The Ninth Circuit has specifically found, however, that "whistleblowing" cannot constitute adequate disruption under *Pickering* to justify a finding in favor of the state. *See Johnson,* 48 F.3d at 427 (citing *Hyland,* 972 F.2d at 1138). As discussed above, the *Johnson* court held that "the County does not have a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistleblowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure." *Id.*

Viewing the facts in the light most favorable to Bardzik, there is a genuine issue of fact as to whether Bardzik's conduct may be construed as "whistleblowing." If his conduct did involve "whistleblowing," then his conduct cannot constitute adequate disruption under *Pickering.* Therefore, the Orange County Defendants' showing of disruption is insufficient on this motion for summary judgment and thus Bardzik's claims are not barred by *Pickering.*

C. Qualified Immunity

■ The Orange County Defendants argue that even if Bardzik prevails under the *Elrod–Branti* Rule or under *Pickering,* Bardzik's claims are nonetheless barred by the qualified immunity doctrine. (Mot. p. 20.) In *DiRuzza,* however, the Ninth Circuit rejected the argument for qualified immunity on a motion for summary judgment on similar facts. *DiRuzza,* 206 F.3d at 1313.

■ "Government officials who perform discretionary functions are entitled to qualified immunity only 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "This test necessitates a two-part analysis: '(1) whether the law governing the official's conduct was clearly established, and (2) whether, given this clearly established standard, a reasonable official could believe that his or her conduct was lawful.'" *See Saucier v. Katz,* 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *DiRuzza,* 206 F.3d at 1313 (citing *Biggs,* 189 F.3d at 989). "While the plaintiff bears the burden of proof regarding whether the right is clearly established, a defendant must prove that his or her conduct was reasonable." *DiRuzza,* 206 F.3d at 1313.

The court in *DiRuzza* explained that, at the time of the alleged retaliation, "it was clearly-established that a non-policy making public employee in a sheriff's office is protected from retaliation for the exercise of First Amendment rights." *Id.* This is also true in the present action. The court further found that it was clearly established that deputy sheriffs were not per se policymakers in California. *Id.* Again, this is true in the present case.

The court then found that the lack of clarity as to whether DiRuzza was a policymaker does not support a claim for qualified immunity. *Id.* at 1314. The court explained that because it presumed the facts to be those most favorable to the non-moving party on summary judgment, the court presumed that DiRuzza was not a policymaker and that the defendants would have known that fact. *Id.* Likewise, for purposes of the qualified immunity analysis, this Court must presume that Bardzik was not a policymaker and that the Orange County Defendants were aware of this. Therefore, it would not be reasonable for the Defendants to believe their conduct was lawful.

Similarly, with regard to *Pickering*, the parties concede that Bardzik's speech was clearly a matter of public interest. In addition, as discussed above, "whistleblowing" is not a sufficient disruption to warrant finding in favor of the government pursuant to the *Pickering* balancing test. This finding was clearly established at the time of the alleged retaliation. Accordingly, this Court rejects the Orange County Defendants' argument that Bardzik's claims are barred by qualified immunity.

## IV. *CONCLUSION*

For the foregoing reasons, the Court denies the Orange County Defendants' mo-

tion for summary judgment or summary adjudication in its entirety.