**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEFF BARDZIK,
          *Plaintiff-Appellee,*

      v.

COUNTY OF ORANGE; ORANGE
COUNTY SHERIFF'S DEPARTMENT,
          *Defendants,*

      and

MICHAEL CARONA,
          *Defendant-Appellant.*

No. 09-55103

D.C. No.
8:07-cv-00141-JVS-
RNB

OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
April 9, 2010—Pasadena, California

Filed March 28, 2011

Before: Harry Pregerson and Robert R. Beezer,
Circuit Judges, and Suzanne B. Conlon, District Judge.*

Opinion by Judge Beezer;
Partial Concurrence and Partial Dissent by Judge Pregerson

---

*The Honorable Suzanne B. Conlon, United States District Judge for
the Northern District of Illinois, sitting by designation.

## COUNSEL

Joshua Piovia-Scott, Hadsell, Stormer, Keeny, Richardson & Renick LLP, Pasadena, California, for the plaintiff-appellee.

Norman J. Watkins and Shannon L. Gustafson, Lynberg & Watkins, Orange, California, for the defendants-appellants.

## OPINION

BEEZER, Circuit Judge:

Plaintiff Jeffrey Bardzik was a lieutenant in the Orange County Sheriff's Department under the command of Defendant Sheriff Michael Carona.[1] Bardzik sues Carona under 42 U.S.C. § 1983, alleging that Carona violated Bardzik's First Amendment right to free speech by retaliating against Bardzik for supporting Carona's opponent in the 2006 Sheriff's election. Bardzik argues that Carona retaliated against him by transferring him from the prestigious position of Reserve Division Commander to an undesirable post at Court Operations. Bardzik also argues that Carona continued punishing him even after he was transferred.

Before the district court, Carona moved for summary judgment, arguing that he was permitted to retaliate against Bardzik for his political activities because Bardzik was a "policymaker" under *Branti v. Finkel*, 445 U.S. 507 (1980), or, at the very least, that Carona was entitled to qualified immunity for his actions. Carona argued that Bardzik was a policymaker because Bardzik was Reserve Division Commander in charge of over 600 reserve officers and because Bardzik proposed and implemented large policy changes in the Reserve Division. The district court denied Carona's motion, and Carona appeals the qualified immunity determination.

We hold that Carona is entitled to qualified immunity for his actions retaliating against Bardzik while Bardzik was Reserve Division Commander because Bardzik was a policymaker in that position. Carona is not entitled to qualified immunity, however, for any further retaliatory action against Bardzik once Bardzik was transferred to Court Operations.

---

[1] There are multiple defendants, but because Carona's qualified immunity is the only issue on appeal, we refer only to Carona.

Under clearly established law, Bardzik was not a policymaker at Court Operations. We affirm in part and reverse in part.

I

The events in this case unfold in Orange County, California, where in 1998, the voters elected Michael Carona to serve them as Sheriff. Under Sheriff Carona, there was an Undersheriff, four assistant sheriffs, 15 captains, 60 lieutenants, and numerous sergeants, and investigators. There were as many as a few thousand deputies in the Department.

When the Sheriff was elected, Jeffrey Bardzik had been a member of the Orange County Sheriff's Department for some time. He had joined the Department in 1984 and ten years later was promoted to sergeant. Almost another decade later, in April 2003, he was promoted to lieutenant.[2] In the fall of 2003, however, Sheriff Carona asked Bardzik to assume more responsibility in the Department and to serve as the Sheriff's Reserve Division Commander.

The promotion was a big step up for Bardzik because Reserve Division Commander was an important position in the Department. The Reserve Division Commander supervised two sergeants and 600 part-time volunteers or "reserves." The Reserve Division consisted of both sworn and nonsworn members. Sworn reserve deputies were given badges, were authorized to make arrests, and were allowed to carry firearms or concealed weapons. In most cases, reserves were assigned to the same duties as regular deputies, such as patrol, booking, surveillance, investigations, and undercover work.[3]

_____

[2]Because we must resolve genuine issues of material fact in Bardzik's favor, *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009), we take the recited facts from Bardzik's Complaint, Deposition, and Declaration, and Plaintiff's Separate Statement of Additional Uncontroverted Facts.

[3]*See* Orange County Sheriff's Department, Reserve Bureau Overview, http://egov.ocgov.com/ocgov/Sheriff-Coroner/Divisions/Field%20Operations/Reserve%20Bureau (last visited Aug. 17, 2010).

Sheriff Carona personally met with Bardzik to give him this new position. He asked Bardzik "to take command of the Reserve Division, clean it up and bring it back to respectability." Carona told Bardzik to "get rid of the dead wood," and "run it like every other division," because it "needed to stop being led like a badge and gun club."

Carona informed Bardzik that he had chosen Bardzik for the job because Bardzik was known as "somebody with the skills to come forward and take the Reserve Division and get it back on track." Carona emphasized that the Division "needed ethical leadership," Bardzik needed "to go in and clean it up," and that there were "no special favors."

Bardzik's exact chain of command to the Sheriff is unclear, but at least for his first year as Reserve Division Commander, Bardzik worked often with the Sheriff. Bardzik met with the Sheriff "face-to-face" three or four times a month, or "depending on what[ was] going on, perhaps a few times a week." Bardzik says that he reported to a captain or assistant sheriff at all times during his tenure as Reserve Division Commander and that his "chain of command was never directly to the Sheriff." In his deposition, however, Bardzik testified that when he first became Reserve Division Commander, his supervisor was largely absent from the Department. According to Bardzik, "without a captain there and without an active assistant sheriff, the reserve division commander, myself, didn't have anybody there. It was at least for some time, for the first half; therefore, it was a chain of command directly to [the Sheriff]." He agreed that "from between approximately November of '03 into November of '04, [he was] essentially heading up the reserves and reporting to Mike Carona with regard to [his] work there" "with the exception of [Captain] Tom Twellman sometimes working with [them]." Later on Bardzik reported to Assistant Sheriff Pete Gannon, but Bardzik still "had day-to-day management responsibility for the reserves."

Bardzik's day-to-day duties as Reserve Division Commander were "never typical." Bardzik would get "calls weekends and nights" regarding personnel issues of the reserve members and "would deal with those [issues] on a regular basis." And when emergencies arose or reserves were needed, Bardzik would "allocat[e] resources out to whoever needed them while making the decision what to keep in case we need[ed] it for something else." Bardzik would also ensure that the reserves maintained their training. He initiated "a lot of very proactive programs" to ensure that the Department had reserves in specialized areas of expertise; he created a high-tech unit and made sure there were swift-water rescue responders in the Reserve Division.

As Reserve Division Commander, Bardzik strove to improve the Division. After working with Captain Tom Twellman on an audit of the Reserve Division, Bardzik recommended a decentralization program. "Carona's January 1, 2005 'state of the department' memo to [the] Orange County Sheriff's Department praised Bardzik's decentralization of the Reserves as one of the 'highlights of the year.' " Bardzik also "implemented" a new "promotional protocol . . . to replace the system of favoritism that was in use before."

Carona decided to make the Reserve Division Commander a captain's post, and he interviewed Bardzik for the new position in Spring 2005. Reserve Division Commander was indeed made a captain's post later that year. According to Bardzik, "the Reserve Division Commander was one of the most prestigious positions in the Department that included a unique set of challenges and responsibilities."

Despite his apparent professional successes, Bardzik became frustrated with the way that Carona ran the Department and the Reserve Division. Carona allegedly appointed political allies to assistant sheriff positions as favors, he allowed nonsworn reserves to carry firearms and badges in violation of California law, and Carona's allies in the Depart-

ment attempted to coerce employees, including Bardzik, into donating money for Carona's campaign.

Bardzik eventually openly supported Carona's opponent, Lieutenant Bill Hunt, in the Sheriff's election, and in the spring or summer of 2005, Bardzik's name appeared on a published list of Hunt supporters.

When Carona discovered Bardzik's support of his opponent, Bardzik's rise through the Department was over. At Carona's instruction, Bardzik was told that he should "resign from law enforcement." Bardzik approached the Sheriff and asked him why he had been told to resign. "Well, the Bill Hunt thing sure didn't help," was the Sheriff's reply. The Sheriff asked Bardzik why he was supporting Lieutenant Hunt, and said, "What were you thinking? You know where you were going in this department." In line with the Sheriff's warnings, in the fall of 2005, Bardzik was transferred to Court Operations where he remained a lieutenant but was no longer a division commander. His position involved less responsibility, less possibility for overtime pay, and was largely regarded as a dead-end job where the Sheriff sent lieutenants he was unhappy with.[4] There, Bardzik was responsible for court security, inmate movement, and weapons screening among other tasks.

Once Bardzik was at Court Operations, the Sheriff continued to retaliate against him. Bardzik and the lieutenant who ran against the Sheriff were the only two lieutenants denied a discretionary pay raise, even though Bardzik's superior officer at Court Operations recommended that Bardzik receive the raise. Carona also took the unprecedented step of directing that Bardzik's rating on his 2005 evaluation be reduced from "exceeds expectations" to "meets expectations." Bardzik was

---

[4]It is undisputed for purposes of this appeal that Carona transferred Bardzik to Court Operations in retaliation for Bardzik's political activities against Carona.

denied the opportunity to interview for Chief of Police positions in 2006 and 2007 even though all lieutenants were allowed to interview even if they were considered unqualified. And Carona's supporters initiated two internal investigations against Bardzik, which were ultimately dismissed as unfounded.

Bardzik filed this suit against Carona under 42 U.S.C. § 1983 for these acts of retaliation, which Bardzik claimed violated his rights under the First Amendment. On Carona's motion for summary judgment, the district court found that there were "material facts in dispute as to Bardzik's duties and whether his duties made him a policymaker subject to partisan dismissal." *Bardzik v. County of Orange*, 605 F. Supp. 2d 1076, 1083 (C.D. Cal. 2009). The district court denied Carona's motion for summary judgment and qualified immunity. Carona appeals the qualified immunity determination here.

## II

To review the district court's conclusion that Bardzik was not a policymaker, we must first determine our standard of review, about which the parties strongly disagree. The district court held that "for purposes of the qualified immunity analysis, this Court must presume that Bardzik was not a policymaker and that the Orange County Defendants were aware of this." *Id.* at 1088. In line with this reasoning, Bardzik argues that we may not review the district court's conclusion that, for purposes of summary judgment, Bardzik was not a policymaker. This is not a correct statement of law.

**[1]** We do not have jurisdiction to review the district court's determination that genuine issues of material fact exist as to Bardzik's duties and responsibilities, and to the extent that disputed facts exist, we assume that Bardzik's version is correct. *See Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009)*; Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (9th

Cir. 2001)*; see also Johnson v. Jones*, 515 U.S. 304, 313, 319-20 (1995) (holding this in a § 1983 excessive force case). But whether the particular duties of Bardzik's position as Reserve Division Commander made him a policymaker is a question of law for the district court—not the jury—and it is a determination that we review de novo. *Hobler v. Brueher*, 325 F.3d 1145, 1151 (9th Cir. 2003); *Walker*, 272 F.3d at 1132; *see Eng*, 552 F.3d at 1067. Resolving all factual disputes in Bardzik's favor, we determine whether Carona is entitled to qualified immunity as a matter of law. *Eng*, 552 F.3d at 1067.

## III

**[2]** The First Amendment[5] protects the rights of citizens to criticize a government official, to support a candidate opposing an elected official, or to run against an elected official. *See Branti*, 445 U.S. at 513-17. A citizen does not check these rights at the door when he accepts a government job. *See id.* Ordinarily, an elected official cannot fire or retaliate against an employee for his political opinions, memberships, or activities. *See id.*

**[3]** Nonetheless, this general rule has some limitations. In *Elrod* and *Branti*, the Supreme Court created the "policymaker exception," recognizing that an elected official must be able to appoint some high-level, personally and politically loyal officials who will help him implement the policies that the public voted for. *See Branti*, 445 U.S. at 517-20; *Elrod v. Burns*, 427 U.S. 347, 367 (1976) (plurality op.); *Hall v. Ford*, 856 F.2d 255, 263 (D.C. Cir. 1988) ("In order for the new administration to be given an opportunity to fulfill expecta-

---

[5] " 'It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case.' " *Elrod v. Burns*, 427 U.S. 347, 357 n.10 (plurality op.) (quoting *Bd. of Educ. v. Barnette*, 319 U.S. 624, 639 (1943)).

tions, it must have available . . . significant facilitators of policy, people who have the *personal and partisan loyalty*, initiative, and enthusiasm that can make the difference between the acclaimed success of a government agency or program and its failure or, more typically, its lackluster performance." (emphasis added) (quoting *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241 (1st Cir. 1986))). An elected official may dismiss these same policymaking employees if they are no longer loyal, if they oppose his re-election, or simply if the official would prefer to work with someone else. "If [an official is] a policymaker, then under *Branti* his government employment could be terminated for purely political reasons without offending the First Amendment." *Fazio v. City of S.F.*, 125 F.3d 1328, 1332 (9th Cir. 1997). We have recognized specifically that the rationale allowing for the patronage dismissal of a policymaker also justifies his dismissal for opposing the employer in an election. *Id.* at 1331-32. If Bardzik occupied a policymaking position, Carona is entitled to qualified immunity for demoting Bardzik in retaliation for supporting Carona's opponent in the 2006 Sheriff's election.

## IV

Under our de novo standard of review and resolving disputes of material fact in Bardzik's favor, Bardzik was a policymaker as Reserve Division Commander. Thus, under *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and *Pearson v. Callahan*, 129 S. Ct. 808, 815-16, 818 (2009), there was no constitutional violation and Carona is entitled to qualified immunity for his allegedly retaliatory demotion of Bardzik.[6]

---

[6]We have the option to address only the clearly-established step of the qualified immunity analysis. *Pearson*, 129 S. Ct. at 818. However, we elect to address whether there was a constitutional violation because the policymaker analysis is fact intensive and unsettled. *See Upton v. Thompson*, 930 F.2d 1209, 1213 (7th Cir. 1991) ("[B]etween the strictly menial government worker (who, under *Elrod* and *Branti*, is clearly and com-

**[4]** We have rejected the argument that all sheriff's deputies, regardless of rank, are per se policymakers. *DiRuzza v. County of Tehama*, 206 F.3d 1304, 1309 (9th Cir. 2000). Not even a sheriff's lieutenant is automatically a policymaker. *Thomas v. Carpenter*, 881 F.2d 828, 832 (9th Cir. 1989) (reversing a Rule 12(b)(6) dismissal of lieutenant's First Amendment retaliation claim).

**[5]** As Bardzik was not a per se policymaker, we must analyze Bardzik's duties as Reserve Division Commander to determine if they fit the description of a policymaker. *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 995 (9th Cir. 1999). We have listed "some" factors to identify a policymaking position: "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." *Fazio*, 125 F.3d at 1334 n.5; *see DiRuzza*, 206 F.3d at 1310.[7]

---

pletely protected from patronage firing) and the policymaker/confidential assistant (whose protection from patronage firing is non-existent), there is a range of government positions for which the propriety of patronage firing has depended largely on the courts' juggling of competing constitutional and political values."); *see also Hall v. Tollett*, 128 F.3d 418, 429-30 (6th Cir. 1997) (lamenting that in an earlier case, "[u]nfortunately, we granted a sheriff qualified immunity, without first determining whether there had actually been a constitutional violation. Therefore, [the case] effectively established only that . . . the state of the law regarding patronage dismissals of sheriffs' deputies was not clearly established" (internal citations omitted)). In these circumstances, it is proper to address *Saucier*'s first step first. *See Pearson*, 129 S. Ct. at 818 ("[T]he *Saucier* Court was certainly correct in noting that the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable.").

[7]Applying similar factors, the Fourth and Eleventh Circuits have held that under *Branti*, deputy sheriffs are policymakers. *See Jenkins v. Medford*, 119 F.3d 1156, 1163-64 (4th Cir. 1997) (holding that because of

**[6]** Viewing the evidence in Bardzik's favor, Bardzik was a policymaker when he was Reserve Division Commander. It is a close question because four of the factors favor Bardzik. However, five factors favor Carona, including the "most critical factor"—influence over programs. *See Walker*, 272 F.3d at 1133 (noting that influence over programs is the "most critical factor" and then discussing broad responsibilities, technical competence, and public perception as important factors). Bardzik had broad responsibility, influence on programs, frequent contact with elected officials, technical competence, power to control others, and actually *did* impede the Sheriff's agenda.

**[7]** Four of the *Fazio* factors favor Bardzik: Carona introduced no evidence to show that Bardzik had a relatively high salary compared to other employees in the Department. Bardzik was only paid $116,000 a year, whereas an assistant sheriff could earn as much as $260,000.

**[8]** Bardzik also did not have authority to speak in the name of policymakers on the current record. Bardzik could not directly send a memorandum to all Department divisions with respect to his Reserve Division decentralization initia-

North Carolina-specific laws deputy sheriffs in North Carolina are policymakers); *Terry v. Cook*, 866 F.2d 373, 377 (11th Cir. 1989) ("Under the *Elrod-Branti* standard, loyalty to the individual sheriff and the goals and policies he seeks to implement through his office is an appropriate requirement for the effective performance of a deputy sheriff. . . . [A sheriff has] absolute authority of appointment and [the authority] to decline to reinstate those who did not support him."). The Fifth Circuit has recognized that deputy sheriffs are policymakers under certain circumstances. *Compare Barrett v. Thomas*, 649 F.2d 1193, 1200-01 (5th Cir. Unit A July 1981) (holding that deputy sheriffs that performed work ranging from "clerical work to law enforcement" were not policymakers), *with McBee v. Jim Hogg County, Tex.*, 703 F.2d 834, 842 (5th Cir. 1983) (holding that plaintiff sheriff's deputies were policymakers in a small office where the deputies were responsible for implementing policy and were representatives of the sheriffs).

tive; rather, Bardzik had to ask the Sheriff to send the memorandum. And superiors upbraided Bardzik for attempting to send the reserves a memorandum on campaign solicitation laws. Relatedly, the public-perception factor weighs in Bardzik's favor because there is no evidence the public knew about Bardzik.

[9] Also "responsiveness to partisan politics and political leaders" is somewhat inconclusive. Initially, Bardzik appeared to be more of a civil servant than a political appointee. Bardzik joined the Department well before Carona was elected, and he was not promoted when Carona came to power. Indeed, Bardzik was made a lieutenant five years after Carona was elected. However, as Bardzik rose through the ranks, his promotions and demotions coincided with changes in Department politics. Carona personally appointed Bardzik to be Reserve Division Commander. And although Bardzik was demoted when he supported the Sheriff's opponent in the election, he was elevated to a new post when a new administration replaced Carona's in 2008. Because this factor is inconclusive, Carona did not carry his burden on this factor.

[10] Although four factors favor Bardzik, Bardzik's importance in the Department and his status as a policymaker become clear when we examine the remaining five factors.

[11] First, Bardzik had vague and broad responsibilities. Carona personally met with Bardzik to give Bardzik his position as Reserve Division Commander and told Bardzik his priorities for the Division. He told Bardzik to "get rid of the dead wood," and to run the Reserves "like every other division," instead of a "badge and gun club." Carona told Bardzik to ensure "that people are up to speed for the assignment that they have" and to improve "the image of the Reserve Division." The district court recognized that these assignments were "somewhat vague and broadly worded," *Bardzik*, 605 F. Supp. 2d at 1081, and acknowledged Bardzik's admission that

"he was 'in effect running the Reserves,' " *id.* (quoting Bardzik Dep.).**⁸** This factor weighs in Carona's favor.

**[12]** Second, Bardzik had influence on Department programs in his effort to carry out the Sheriff's sweeping mandate. To clean up the Reserves, Bardzik and Captain Twellman conducted an audit of the Division and "recommended numerous changes" to ensure that the Reserve Division was in compliance with California's Commission on Peace Officer Standards and Training. Bardzik initiated programs to ensure that the Department had reserves trained in various areas such as swift water rescue and high-tech areas. He also initiated a Reserve Division decentralization program, which created a separate Reserve Liaison position with every division, contract city, and court to help coordinate reserve requests. Sheriff Carona's "state of the department" memo "praised Bardzik's decentralization of the Reserves as one of the 'highlights of the year.' " Bardzik likewise re-instituted the Reserve Newsletter and implemented a new promotion system to replace the "system of favoritism" that was in place previously. And he attempted the controversial task of taking firearms and badges away from reserves who were not in compliance with the law or Department requirements.

Although Bardzik could not approve expenditures over $300, or unilaterally create policy, the ability to "unilaterally" create and implement programs without any input from the Sheriff is not required by our case law or by logic. *See Biggs*, 189 F.3d at 996 (holding that the plaintiff-law firm associate who represented the government was a policymaker even though her work was subject to review by partners). The

---

**⁸**The district court then countered that "this says nothing about what running or managing the Reserves entailed." *Bardzik*, 605 F. Supp. 2d at 1082. However, Carona amply demonstrates with Bardzik's own testimony what running the Reserves actually entailed. We analyze Bardzik's duties in "running the Reserves" under the second factor, influence on Department programs.

weight of the evidence shows that Bardzik influenced many Reserve Division programs.

**[13]** Third, Bardzik had frequent and meaningful contact with the elected official, the Sheriff. Even the district court recognized that the "contact with elected officials" factor "weighs somewhat in favor of the Orange County Defendants' argument." *Bardzik*, 605 F. Supp. 2d at 1082. In his Declaration, Bardzik states, "My chain of command was never directly to the Sheriff as I always reported to a Captain or Assistant Sheriff." This statement directly contradicts Bardzik's deposition where he testified that his chain of command *did* go directly to the Sheriff for awhile. Because contradictory testimony raises a genuine issue of material fact, we must assume that Bardzik's chain of command never went directly to the Sheriff. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991). Even then, however, Bardzik met with the Sheriff in the first year three or four times a month and even a few times a week "depending on what[ was] going on." He also testified that during his first year as Reserve Division Commander, there was in effect no assistant sheriff or captain supervising him at the Reserves. Thus, this factor weighs in Carona's favor.

**[14]** Fourth, Bardzik had particular technical competence to serve as Reserve Division Commander. Carona hired Bardzik because he recognized that Bardzik was "somebody with the skills to come forward and take the Reserve Division and get it back on track." Carona told Bardzik that the Reserves "needed ethical leadership."

Bardzik demonstrated that he was in fact skilled for the leadership role. Bardzik testified that by the time he was transferred to Court Operations, "I had a wealth of knowledge and had fine-tuned [Reserve operations] . . . . [I]t was at the most efficient point it ever was[,] not only in the time that I was there, but, as I was told by my superiors, any time in the Reserve Division." This factor favors Carona.

**[15]** Fifth, with respect to the "power to control others" factor, Bardzik supervised two sergeants, four clerical staff, and approximately 600 volunteer reserve members. He ensured that there were sufficient reserves trained in specialized areas, he assigned reserves when they were needed, and he recommended and implemented a new promotional protocol within the Reserve Division. Bardzik testified that:

> I interacted with just about every division in the entire department because that's where reserves could work. You can imagine with a force division that large, the personnel issues with 600 members. . . . [I]t wouldn't be unusual to get calls weekends and nights. So I would deal with those [issues] on a regular basis.
>
>      . . . .
>
>     . . . [I] allocat[ed] resources out to whoever needed them while making the decision what to keep in case we need[ed] it for something else and along with that all the training that goes into these people not only to initiate them to become skilled, but to maintain their training as the law provides and elsewhere . . . . I could waste many pages going on and on, that type of thing.

There are some countervailing considerations on this factor: Bardzik had to send his reviews and promotion recommendations regarding reserve members up the chain of command. He did not supervise the reserves while they were working in other divisions, he did not train the reserves himself, and he referred personnel problems to the Department's Personnel Division. However, the fact that Bardzik did not train reserves or deal with personnel issues himself, *id.*, says little about whether the Reserve Division Commander was a policymaking position. *See Thomas*, 881 F.2d at 832 (recognizing that whether a plaintiff evaluates his inferior officers has little

bearing on the policymaker analysis). What matters is that he *oversaw* reserve training and personnel issues.[9] In light of the extensive authority that Bardzik wielded over the members of the Reserve Division, this factor weighs in Bardzik's favor.

[16] Finally, the *Fazio* factors are not exclusive, *Fazio*, 125 F.3d at 1334 n.5, and we find persuasive a factor not specifically enumerated in that case: Bardzik actively sought to undermine the Sheriff's policies. *Elrod* states that the exception allowing patronage dismissals of policymakers helps ensure "that representative government not be undercut by tactics obstructing the implementation of policies [of elected officials], policies presumably sanctioned by the electorate." 427 U.S. at 366. But nonpolicymaking employees cannot be dismissed for political reasons because "[n]onpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party." *Id.*

[17] Here, Bardzik *was* in a position to thwart the Sheriff's agenda. He tried to take badges away from the Sheriff's political allies under his interpretation of the law, and the Sheriff told him to "leave it alone." In October 2004, Bardzik told the Sheriff that it was a misdemeanor under California Penal Code § 538d to issue a badge to a nonsworn reserve that resembles a police officer's badge and that Bardzik "refused to participate in any future issuing of inappropriate law enforcement badges" to the nonsworn reserves. Carona told Bardzik, "look me in the eye when I tell you this Lieutenant,

---

[9]Bardzik did not personally train the reserves but ensured that the Department had reserves trained in specialized areas. He was responsible for "a lot of very proactive programs" to fill Department needs for reserves with specific expertise. This distinction is logical because it is unlikely that Bardzik would have sufficient expertise in all areas in which reserves worked: he would not be able to teach swift-water rescue himself and computer hacking. Rather than training the reserves, he oversaw the training program.

I don't give a shit about § 538d . . . . I'm going to change the law."

**[18]** Bardzik also attempted to send a memorandum to the reserves regarding the legal propriety of campaign solicitations. When the Sheriff found out, he was "furious" and ordered Bardzik not to draft or send the memorandum to the reserves. Likewise, Bardzik openly criticized the Sheriff's decisions as unethical on- and off-duty. Bardzik was working within the Sheriff's Department against the Sheriff's agenda because Bardzik believed the agenda to be illegal or against Department protocol. Bardzik ultimately admitted that he told Carona that the disagreement between the two men boiled down to the fact that Carona "expected loyalty to him as a person and his personal agenda over what [Bardzik] believed was paramount"; in other words, "loyalty to an individual and the man versus loyalty to the organization and the welfare of the whole."

**[19]** There is no legitimate interest in covering up corruption, and Bardzik was certainly entitled to expose the Sheriff's alleged wrongdoing to the public. However, often in political contests, one side may accuse the other of acting illegally. An elected official need not retain a high-ranking official in a position to undermine the official's credibility and goals when neither the electorate nor an appropriate agency has determined that the official has violated the law. "[T]hough a private person is perfectly free to uninhibitedly and robustly criticize [an elected official's policies], we have never suggested that the Constitution bars the [elected official] from firing a high-ranking deputy for doing the same thing." *Moran v. Washington*, 147 F.3d 839, 842, 850 (9th Cir. 1998) (holding for defendant in part because the plaintiff-policymaker "insubordinately opposed the development and implementation" of her superior's program because the plaintiff believed that the program "constituted 'unlawful political activity' "); *see Fazio*, 125 F.3d at 1333 ("Indeed, 'a public agency would be unmanageable if its head had to . . . retain his political ene-

mies . . . in positions of confidence or positions in which they would be . . . exercising discretion in the implementation of policy.' " (quoting *Wilbur v. Mahan*, 3 F.3d 214, 217 (7th Cir. 1993))). Because Bardzik was a "policymaker," Carona did not violate the Constitution by demoting Bardzik and transferring him to Court Operations, and Carona is entitled to qualified immunity.[10]

Ninth Circuit case law lends support to our conclusion that Bardzik was a policymaker. In *DiRuzza*, we concluded that the plaintiff was not a policymaker for summary judgment purposes because she was a rank-and-file deputy sheriff. 206 F.3d at 1314. We reasoned that "[d]eputy sheriffs appear to be the lowest ranking peace officers in the department . . . below other categories of employees such as sergeants and sheriff's detective investigators." *Id.* at 1310-11.[11] We relied on the fact that DiRuzza worked in positions associated with jails and cited other circuits' cases that have held that positions associated with jails and courtroom security are nonpolicymaking positions. *See id.* at 1311 (citing *Burns v. County of Cambria*, 971 F.2d 1015, 1022 (3d Cir. 1992), and *Hall v. Tollett*, 128 F.3d 418, 429 (6th Cir. 1997)). And although DiRuzza drafted a new "policy manual," for the new jail, we did not accord this fact much weight as this manual only concerned such menial topics as procedures for handling prisoners' mail. *See id.*

---

[10]Because we decide that Bardzik was a policymaker as Reserve Division Commander, we need not address the clearly-established prong of the qualified immunity analysis. *See Pearson*, 129 S. Ct. at 818. However, *DiRuzza* and *Thomas* demonstrate that Carona would be entitled to qualified immunity under that prong as well.

[11]*DiRuzza* in this respect is somewhat confusing as it states that all peace officers in the sheriff's department are "deputy sheriffs" and then merely calls DiRuzza a "deputy sheriff." However, the opinion makes clear that DiRuzza was a rank-and-file deputy because the opinion states that she was in a position lower than a sergeant or detective investigator. *DiRuzza*, 206 F.3d at 1310-11.

Unlike DiRuzza, Bardzik was not a line deputy occupying the lowest position in the Department, but he was a lieutenant and Reserve Division Commander—"one of the most prestigious positions in the Department." As Reserve Division Commander, Bardzik did not do menial tasks associated with jails or courtroom security. And with respect to chain of command, the difference between DiRuzza and Bardzik is also clear: on her projects, DiRuzza was a deputy assisting a lieutenant and a sergeant, *see id.*, but here, Bardzik was a lieutenant, assisting captains, assistant sheriffs, and the Sheriff himself.[12]

V

Because we have determined that Bardzik was a policymaker when he was Reserve Division Commander, we address the district court's conclusion that even if Bardzik was a policymaker, summary judgment for the defendants was still inappropriate. *Bardzik*, 605 F. Supp. 2d at 1084-86. The district court recognized that "[t]he underlying purpose of the *Elrod-Branti* policymaker exception is to protect a legitimate government interest of vital importance." *Id.* at 1085

---

[12]We do have one case concerning a lieutenant in a California Sheriff's Department, *Thomas v. Carpenter*, but it has limited significance here because it was an appeal from a Rule 12(b)(6) dismissal. *See Thomas*, 881 F.2d at 832. *Thomas* merely held that the defendant could not show, "based *solely on the allegations of Thomas's complaint*, that Thomas's political loyalty [was] essential to the effective performance" of Thomas's position as a lieutenant. *Id.* (emphasis added). Unlike *Thomas*, which was decided on a motion to dismiss, this case comes to us after summary judgment with multiple volumes of factual record. Even then, unlike Bardzik, Thomas was not a division commander, *id.* at 829, and Thomas's only functions that the defendant pointed to as "policymaking" were attending informational weekly staff meetings and participating as an evaluator of a high-risk entry team, *id.* at 832. We doubted that there was any discretion or policymaking involved in these duties, and we recognized that under a motion to dismiss, it was unclear what Thomas's participation in policy manual meetings involved. *Id.* If anything, *Thomas* supports our conclusion that Bardzik was a policymaker at the Reserve Division.

(emphasis omitted). From this proposition, the district court reasoned that even if Bardzik was a policymaker, Carona would *still* have to show that retaliating against Bardzik served a vital government interest. *Id.* at 1085-86. The court noted that Bardzik acted as a whistleblower of sorts and attempted to expose government corruption. *Id.* There was "no legitimate government interest in the covering up and perpetuation of corruption," the district court concluded. *Id.* at 1085.

We have never held that an official cannot fire a politically disloyal policymaker because the policymaker has accused the official of corruption. For this reason alone the Sheriff would be entitled to qualified immunity. But more importantly, this argument is foreclosed by our precedent, *Fazio v. City of San Francisco*, 125 F.3d at 1334. *Fazio* holds that if a plaintiff is a policymaker, the court will not consider the plaintiff's claim that under *Pickering v. Board of Education*, 391 U.S. 563 (1968), the plaintiff's "interest in free speech outweighs the [defendants'] interest in running an efficient office." *Fazio*, 125 F.3d at 1334.[13] A plaintiff's status as a policymaker is dispositive. *Walker*, 272 F.3d at 1131; *Biggs*, 189 F.3d at 995.

An elected official should not be forced to retain his high-ranking deputy solely because the deputy accused him of corruption. In the face of a similar argument, the Ninth Circuit has noted, "If a public official is permitted to fire a confiden-

---

[13]We have considered that the government "does not have a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistleblowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure." *Johnson v. Multnomah County*, 48 F.3d 420, 427 (9th Cir. 1995). However, that case involved a nonpolicymaker, and when the employee is a policymaker, the vital interest is in allowing elected officials to choose their policymakers based on their political loyalty and preference, not in covering up corruption. Only if a plaintiff is a nonpolicymaker do we conduct a *Pickering* analysis. *Walker*, 272 F.3d at 1031.

tial or policymaking employee merely because the latter quietly, inoffensively, undemonstratively belongs to the wrong political party . . . the official should be permitted to fire the same employee when the latter asks the electorate to throw the rascal out and put himself into the rascal's office." *Fazio*, 125 F.3d at 1332 (quoting *Wilbur*, 3 F.3d at 218); *see also Curinga v. City of Clairton*, 357 F.3d 305, 313 n.8 (3d Cir. 2004) (noting that "[t]he Ninth Circuit allows for disciplinary action against policymakers for any type of speech under *Elrod*, including speech not related to policy views or a political agenda").[14]

## VI

**[20]** For the same reasons that Carona is entitled to qualified immunity for his actions retaliating against Bardzik while Bardzik was Reserve Division Commander, he is *not* entitled to qualified immunity once Bardzik was transferred to Court Operations. Bardzik was not a policymaker at Court Operations. While at Court Operations, Bardzik supervised three sergeants and a civilian supervisor for inmate movement. He did civil processing, security, weapons screening, and conferred with judges and other divisions in the Department as it pertained to court security. Viewing the facts on the current record in Bardzik's favor, none of the *Fazio* factors indicate that Bardzik was a policymaker.

---

[14]The district court also held that even if Bardzik was a policymaker as a Reserve Division Commander, Carona's "improper harassment" of Bardzik could not "be justified under the policymaker exception." *Bardzik*, 605 F. Supp. 2d at 1084. We need not address this argument because the additional acts of harassment—including the internal investigations, refusing to allow Bardzik to interview for Chief of Police, denying Bardzik salary raises, and lowering Bardzik's performance reviews—took place *after* Bardzik was transferred to Court Operations. As discussed in Part VI below, Carona is not entitled to qualified immunity for his retaliatory actions against Bardzik when Bardzik was stationed at Court Operations.

**[21]** It was also clearly established under Supreme Court and Ninth Circuit precedent that Bardzik was not a policymaker at Court Operations. Although the policymaker analysis is unsettled and difficult for many employment positions, positions associated with jails and courtroom security are not policymaking positions. Indeed, the Supreme Court in *Branti* clarified that the employees in *Elrod*, including "a bailiff and security guard at the [j]uvenile [c]ourt," were not policymakers. *Branti*, 445 U.S. at 517*; see Elrod*, 427 U.S. at 350-51. Likewise, *DiRuzza* relied on the fact that the plaintiff worked in positions associated with jails to hold that she was not a policymaker for summary judgment purposes. 206 F.3d at 1311. Citing cases from various circuits, *DiRuzza* stated that "political affiliation is not an appropriate job requirement for deputy sheriffs whose primary tasks are service of process, transport of prisoners, and courtroom security." *Id.* (citing *Burns*, 971 F.2d at 1022). *DiRuzza* specifically noted that the Eleventh Circuit has distinguished "the positions of clerk, investigator, dispatcher, jailer, and process server" from policymaking employees. *See id.* (citing *Terry v. Cook*, 866 F.2d 373, 377-78 (11th Cir. 1989)). These duties resemble Bardzik's at Court Operations. It was clearly established at the time of Carona's retaliatory actions that Bardzik was a not a policymaker at Court Operations, and a reasonable official would have known that. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987).[15]

## VII

**[22]** Carona is entitled to qualified immunity for his retaliatory actions against Bardzik until and including Bardzik's

---

[15]Because Bardzik was not a policymaker for summary judgment purposes at Court Operations, we would normally proceed to an analysis of the *Pickering* factors to determine if the plaintiff's "interest in free speech outweigh[ed] the [defendants'] interest in running an efficient office" during the time Bardzik was at Court Operations. *Fazio*, 125 F.3d at 1334. However, Carona did not appeal the district court's decision that his actions were not protected by the *Pickering* balancing test.

transfer to Court Operations because as Reserve Division Commander, Bardzik was a policymaker. Carona, however, is not entitled to qualified immunity after Bardzik's transfer because it was clearly established that Bardzik was a nonpolicymaker at Court Operations.

## AFFIRMED IN PART and REVERSED IN PART.[16]

PREGERSON, Circuit Judge, concurring in part and dissenting in part:

The majority holds that Bardzik was a policymaker while serving as Reserve Division Commander, but was not a policymaker while serving in Court Operations. I agree that whether Bardzik was a policymaker while serving as Reserve Division Commander is a close question. *See* Maj. op. at 4125. However, resolving all factual disputes in Bardzik's favor, I would conclude that he was not a policymaker in either the Reserve Division or in Court Operations. Thus, I dissent from the majority opinion in part.

To conclude that Bardzik was a policymaker while commanding the Reserve Division, the majority analyzes Bardzik's duties under the factors stated in *Fazio v. City of San Francisco*, 125 F.3d 1328, 1334 n.5 (9th Cir. 1997) ("vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders"). The majority concedes that some of the factors favor Bardzik: he did not have a relatively high salary, he did not have authority to speak on behalf of policymakers, and he did not enjoy public notoriety. Maj. op. at

---

[16]Pursuant to Federal Rule of Appellate Procedure 39(a)(4), each party shall bear its own costs.

4152-26. The majority also holds that the factor of "responsiveness to partisan politics and political leaders" is inconclusive. Maj. op. at 4126.

In my view, the remaining *Fazio* factors also fail to support the conclusion that Bardzik was a policymaker with reference to the Reserve Division.

## 1. Control of Others

The majority argues that Bardzik had the "power to control others" as Reserve Division Commander. Maj. op. at 4129. But in that position, Bardzik supervised only one more full-time paid employee than he did in Court Operations, a position the majority holds was not policymaking. Maj. op. at 4135. Thus, considering full-time, paid subordinates, his position as Reserve Division Commander was about the same as his job in Court Operations.

Nor does the record indicate that Bardzik had significant control over the 600 part-time volunteer reserve members (many of whom were not authorized to wear a badge or carry a firearm). Bardzik explains that as manager of the Reserve Division, his job was to see to it that the reserve members followed already-established departmental policies. The majority acknowledges that Bardzik could not by himself evaluate or promote the reserve members, but was required to send evaluations and recommendations for promotion up the chain of command for approval by the Assistant Sheriff. Maj. op. at 4129-30. Bardzik did not supervise or train the reserve members; instead, they were supervised and trained by the divisions to which they were allocated. The process of allocating reserve members to divisions that needed them was effectively taken out of Bardzik's hands by the decentralization program; reserve liaisons in each division could request reserve members without notifying Bardzik. Personnel issues were referred to and handled by the personnel division, not by Bardzik. Making every reasonable inference in Bardzik's

favor, it would appear that Bardzik had little control over the reserve component.

The majority tells us that whether Bardzik actually trained or dealt with the personnel issues of his subordinates is immaterial, so long as he "oversaw reserve training and personnel issues." Maj. op. at 4130. The term "oversaw" suggests that Bardzik delegated the training and personnel issues while retaining supervisory authority. There is no evidence in the record that Bardzik retained any supervisory authority over personnel issues once he referred a reserve member to the personnel division. As for training, to the extent that Bardzik was authorized to recommend a course of training for a reserve member, he was still required to obtain the Assistant Sheriff's approval.

The majority cites *Thomas v. Carpenter*, 881 F.2d 828 (9th Cir. 1989) to support the argument that Bardzik was a policymaker. But *Thomas* favors Bardzik's position. In *Thomas*, we held that, on the pleadings, a sheriff's lieutenant was *not* a policymaker despite being involved in training and evaluating the department's high risk entry team. *Id.* at 829, 832. We reasoned that training and evaluation of subordinates "has no significant relationship to one's political loyalty." *Id.* at 832. So even if Bardzik *was* involved in the training and supervision of the reserve members, under *Thomas* that involvement would not weigh in favor of finding that Bardzik was a policymaker. The facts of Bardzik's case are even stronger than those of the lieutenant in *Thomas*: the record shows that Bardzik was only tangentially involved in training and supervision. Thus, reading the record in the manner most favorable to Bardzik, one must conclude that he did not have any significant control of others, and therefore the control factor does not weigh in Sheriff Carona's favor.

## 2. Influence on Programs

The majority argues that Bardzik had influence on the department's programs, Maj. op. at 4127, and that this is the

" 'most critical factor' " in the policymaker analysis. Maj. op. at 4125 (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1133 (9th Cir. 2001)). The majority misreads *Walker*: influence on programs was the "most critical factor" in *Walker* because the city of Lakewood "had delegated total control over its fair housing program" to the plaintiff. *Walker*, 272 F.3d at 1133. There is no indication that influence on programs is per se the "most critical factor" in *every* case. Certainly the Sheriff's Department had not delegated total control over the Reserve Division to Bardzik, given that Bardzik had to seek approval from his superiors for virtually every action he took.

Moreover, many of the programs mentioned by the majority as evidence of Bardzik's influence do not support the majority's position. The majority refers to an audit of the Reserve Division that Bardzik helped conduct. But the majority itself points out that Captain Twellman headed that project, not Bardzik. Maj. op. at 4127. Further, the goal of the audit was to bring the reserve members into compliance with already-established standards set by a state commission, not to set new policy. Bardzik apparently initiated some programs to train reserve members in swift water rescue and computers, but as discussed earlier, under *Thomas*, the training of subordinates is not determinative in policymaker analysis. 881 F.2d at 832. Bardzik also initiated the decentralization program, but this served to *reduce* his influence, relinquishing much of his supervisory authority to the reserve liaisons and other officials in each of the department's divisions. On balance, the record clearly indicates that Bardzik did not have any significant influence on the department's programs.

## 3.   Additional Factors

The majority argues that Bardzik had "particular technical competence to serve as Reserve Division Commander." Maj. op. at 4128. The only evidence of this factor is Sheriff Carona's statement that Bardzik had "skills," and Bardzik's

assertion that the Reserve Division was running better than ever during his tenure as commander. These vague assertions are insufficient to draw an inference that Bardzik had "particular technical competence."

The majority further argues that Bardzik had "vague and broad responsibilities." Maj. op. at 4126. Whatever generalities Sheriff Carona may have said to Bardzik about his duties as Reserve Division Commander, the record indicates that Bardzik's main duties involved monitoring reserve members' compliance with departmental policies, and ensuring that reserve resources were allocated where needed (this latter duty was diminished by the decentralization program, which allowed reserve members to be allocated without Bardzik's involvement). Contrary to the majority's assertion, these are not "vague and broad responsibilities."

The majority also points out that Bardzik had "frequent and meaningful contact" with the Sheriff, an elected official. Maj. op. at 4128. But the record makes clear that this contact happened when Bardzik was first appointed as Reserve Division Commander, and ended when a new Assistant Sheriff was assigned to the division in November 2004. The record is silent as to the extent of Bardzik's contact with Sheriff Carona once the new Assistant Sheriff came on board. Because every inference must be made in Bardzik's favor, we must assume that after November 2004 he no longer had "frequent and meaningful contact" with the Sheriff. Thus, in October 2005, when Sheriff Carona decided to retaliate against Bardzik by transferring him to Court Operations, there was no "frequent and meaningful contact" between the two, and that factor does not weigh in favor of Sheriff Carona.

Finally, the majority argues that Bardzik was "in a position to thwart the Sheriff's agenda," an additional factor not mentioned in *Fazio*. Maj. op. at 4130 The record, in fact, indicates that Bardzik was quite powerless to thwart the Sheriff. As the majority acknowledges, Bardzik "tried to take badges away

from the Sheriff's political allies," but the Sheriff stopped him from doing so. Maj. op. at 4130. Similarly, the Sheriff stopped Bardzik from sending memoranda to the reserve members regarding campaign solicitations. Maj. op. at 4131. With limited ability to communicate with the reserves supposedly under his command, and with no public presence or ability to speak on behalf of the department (*see* Maj. op. at 4125-26), Bardzik was hardly in a position to do much political damage to the Sheriff. Perhaps Bardzik criticized the Sheriff openly, but so could any sheriff's deputy, whether policymaker or not. This factor does not support a finding that Bardzik was a policymaker.

**Conclusion**

Because the record as currently developed does not support the conclusion that Bardzik was a policymaker while Reserve Division Commander, I would hold that our decision in *DiRuzza v. County of Tehama*, 206 F.3d 1304 (9th Cir. 2000), compels us to affirm the district court. In *DiRuzza*, a sheriff's deputy brought suit after being fired for supporting the Sheriff's opponent in an election. *Id.* at 1306. As in Bardzik's case, the qualified immunity question came down to whether DiRuzza was a policymaker or not. *Id.* at 1313-14. We acknowledged that the record was unclear as to "whether DiRuzza's job actually entailed policymaking." *Id.* at 1314. But at the summary judgment stage, drawing all inferences in DiRuzza's favor, we concluded that she was not a policymaker, and her superiors would have been well aware of that fact. *Id.* Thus, DiRuzza's superiors were not entitled to qualified immunity. *Id.*

Similarly, I would find that, construing the record in Bardzik's favor, Bardzik was not a policymaker while serving as Reserve Division Commander. Thus, under *DiRuzza*, I would hold that Sheriff Carona is not entitled to qualified immunity. I would affirm the district court across the board.