**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM J. HUNT,
                        *Plaintiff-Appellant,*

                v.

COUNTY OF ORANGE; MICHAEL S.
CORONA, Sheriff-Coroner for the
County of Orange,
                        *Defendants-Appellees.*

No. 10-55163

D.C. No.
8:07-cv-00705-
MMM-MLG

OPINION

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Argued and Submitted
October 11, 2011—Pasadena, California

Filed February 13, 2012

Before: Edward Leavy and Kim McLane Wardlaw,
Circuit Judges, and James C. Mahan, District Judge.*

Opinion by Judge Wardlaw;
Partial Concurrence and Partial Dissent by Judge Leavy

*The Honorable James C. Mahan, District Judge for the United States District Court for Nevada, sitting by designation.

## COUNSEL

Stephen H. Silver and Richard A. Levine, Silver, Hadden, Silver, Wexler, & Levine for plaintiff-appellant William J. Hunt.

Norman J. Watkins and S. Frank Harrell, Lynberg & Watkins for defendants-appellees County of Orange and Michael S. Carona.

## OPINION

WARDLAW, Circuit Judge:

The day after his scandal-ridden third election to the position of Orange County Sheriff-Coroner, Michael Carona

placed on administrative leave William Hunt, a former lieutenant officer with the Orange County Sheriff's Department (OCSD), who had dared to enter the race and campaign against Carona's alleged culture of corruption. Carona then demoted Hunt, an action that prompted Hunt to file this 42 U.S.C. § 1983 suit claiming that his placement on administrative leave and subsequent demotion were in unconstitutional retaliation for the exercise of his First Amendment rights. The district court concluded that Hunt's campaign speech was not protected by the First Amendment because, based upon special factual findings by a jury, Hunt fell into the narrow "policymaker" exception to the general rule against politically-motivated dismissals. Although we determine that the district court erred in this conclusion, we agree with the district court's alternative holding that Carona is entitled to qualified immunity because a government official in his position "reasonably but mistakenly" could have believed that political loyalty was required by someone with Hunt's job responsibilities at the time he ran against Carona. We therefore affirm the judgment of the district court.

## I.

A lieutenant in the OCSD, Hunt was the Chief of Police Services for the City of San Clemente, which contracted with the OCSD for police services. In May 2005, Hunt announced that he would challenge Carona, the incumbent Orange County sheriff, in the upcoming June 6, 2006 election. During the campaign, Hunt issued public statements, radio addresses, press releases, and campaign literature critical of Carona's performance as sheriff, including allegations of corruption in the department. Carona defeated Hunt in the June 6 election and, on June 7, placed Hunt on administrative leave pending a personnel investigation regarding his speech and conduct during the campaign. Hunt was served with a notice of pending demotion on October 31, 2006 for "failing to perform [his] duties and responsibilities as a member of the Department's management team" and for violation of department

rules prohibiting, among other things, bringing discredit upon the department. The notice catalogued Hunt's critical campaign communications and concluded that "[t]he Department lacks the confidence in [Hunt's] abilities to further the mission of this agency." Hunt was then demoted three ranks. Carona does not dispute that Hunt was demoted based on his campaign communications.

Hunt filed a complaint against Carona, Orange County, and other unnamed defendants alleging the violation of his First and Fourteenth Amendment rights under § 1983, as well as several causes of action under state law that were dismissed and are not at issue here. Before trial, the district court dismissed Orange County as a defendant on the ground that Hunt had abandoned his *Monell* municipal liability claim, and there was thus no longer a cognizable claim against the county.

Because the question of whether Hunt's position required political loyalty was critical to whether he fell into the policymaker liability exception to the First Amendment, the parties tried the nature of Hunt's responsibilities and OCSD position to a jury. The district court instructed the jury to answer thirty-seven special interrogatories related to Hunt's position. The jury concluded, among other things, that:

> Hunt did *not* have policymaking authority over any area of policy;

> Hunt did *not* formulate, substantially influence, or substantially influence modifications to any department-wide policy;

> Hunt did *not* formulate or substantially influence plans to implement the broad goals of the OCSD department-wide;

> Hunt did *not* formulate policy that affected San Clemente;

> Hunt did *not* exercise discretion in setting policy for the OCSD in San Clemente; Hunt did *not* directly and regularly communicate with Carona;

> Hunt did *not* usually speak with Carona, as Hunt generally approached his supervisor or other department officials when confronted with policy-related decisions;

> Hunt did *not* act as an advisor to Carona or the Assistant Sheriffs;

> Hunt did *not* have authority to speak to the media without prior approval of higher-ranking officials;

> Hunt did *not* have a vaguely worded job description; and

> Neither Carona's, the Captains', nor the Assistant Sheriffs' trust and confidence was necessary for Hunt to adequately perform his duties.

The jury did conclude that although Hunt did not formulate policy, he substantially influenced department policy affecting San Clemente and had discretion in how to implement policy in San Clemente within the general framework provided by the department.

The district court granted judgment as a matter of law to Carona after concluding that Hunt occupied a policymaking position for which political loyalty was an appropriate requirement based on the jury's special findings, and thus his demotion for political reasons did not violate the First Amendment, *Elrod v. Burns*, 427 U.S. 347 (1976). The district court relied heavily on the nine factors we set forth as relevant to a "policymaker" determination in *Fazio v. City and County of San Francisco*, 125 F.3d 1328, 1334 n.5 (9th Cir. 1997). Concluding that the *Fazio* factors suggested that Hunt

was a "policymaker," the district court ruled that political loyalty was an appropriate requirement of Hunt's job because he "had sufficient authority to thwart or interfere with the Sheriff's implementation of the policies he set for OCSD in [San Clemente]." Alternatively, the district court held that even if Hunt was not deemed a policymaker, Carona was entitled to qualified immunity for concluding that Hunt was.

## II.

We review de novo a district court's grant of judgment as a matter of law. *Summers v. Delta Air Lines, Inc.*, 508 F.3d 923, 926 (9th Cir. 2007). In so doing, we "must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## A.

The question before us is whether Hunt falls within the "policymaker" exception to the First Amendment, and thus cannot avail himself of any constitutional protection against his demotion on the basis of his political speech.

**[1]** The First Amendment ordinarily prohibits an elected official from firing or retaliating against an employee for his political opinions, memberships, or activities. *See Branti v. Finkel*, 445 U.S. 507, 515-16 (1980) ("[U]nless the government can demonstrate an overriding interest of vital importance requiring that a person's private beliefs conform to those of the hiring authority, his beliefs cannot be the sole basis for depriving him of continued public employment.") (citations and quotation marks omitted); *Elrod*, 427 U.S. at 357 (noting that the practice of patronage dismissals "unavoidably confronts decisions by this Court either invalidating or recognizing as invalid government action that inhibits belief and association through the conditioning of public employment on political faith").

**[2]** The Supreme Court carved out an exception to this general prohibition in *Elrod*, permitting dismissals on the basis of political beliefs of those employees in "policymaking positions" so that "representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." 427 U.S. at 367. Because such dismissals and demotions potentially infringe upon constitutional rights, we have held that the exception is "narrow" and should be applied with caution. *DiRuzza v. County of Tehamma*, 206 F.3d 1304, 1308 (9th Cir. 2000) (reading *Elrod* and *Branti* as carving out a "narrow exception").

**B.**

We disagree with the district court's conclusion that Hunt fell within the *Elrod* "policymaker" exception and was thus permissibly terminated on the basis of his campaign speech. The district court's application of the "policymaker" exception misinterprets both the Supreme Court's and our own doctrine establishing the contours of the exception. Although the factors set forth in *Fazio*, 125 F.3d at 1334 n.5, are relevant considerations in determining whether Hunt is a policymaker, they should not be considered in a vacuum, but rather in light of the underlying purpose of the "policymaker" exception.

**[3]** The essential inquiry in determining whether the *Elrod* "policymaker" exception applies is not whether the nine *Fazio* factors mechanically apply, or "whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518; *id.* at 517 ("[I]f an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield . . . .") (quoting *Elrod*, 427 U.S. at 366); *Fazio*, 125 F.3d at 1332 ("[A] public employee need not literally *make* policy in order

to fit within the *Elrod* policymaker exception. Rather, an employer may fire a public employee for purely political reasons if the employer can demonstrate that political considerations are 'appropriate requirement[s] for the effective performance' of the job.") (quoting *Branti*, 445 U.S. at 518); *Fazio*, 125 F.3d at 1333 ("[T]he term policymaker as used in this context does not mean 'one who makes policy.' Rather, the term refers to a position in which political considerations are 'appropriate requirement[s] for the effective performance of the public office involved.' ") (quoting *Branti*, 445 U.S. at 519); *Thomas v. Carpenter*, 881 F.2d 828, 832 (9th Cir. 1989) (holding that the exception applies only where the government has shown that the employee's political loyalty is essential to the effective performance of the tasks).

**[4]** Here, the record fails to establish that Hunt's party affiliation or political outlook were relevant to the effective discharge of his professional duties. Indeed, the jury — in its special findings of fact — explicitly found to the contrary. The jury found that neither Carona's, the Captains', nor the Assistant Sheriffs' trust and confidence was necessary for Hunt to perform his job. The jury also found that Hunt's political statements — which were the basis of his demotion — did not cause, and could not have been reasonably predicted to cause, a disruption in the efficient operation of the department.

**[5]** These findings establish that political considerations were not appropriate requirements for the effective performance of Hunt's job and are sufficient to end the "policymaker" inquiry. Indeed, if Hunt clearly falls outside of the intended purpose and scope of the *Elrod* exception on the basis of the jury's factual findings, then we need not necessarily examine the *Fazio* factors in order to determine whether Hunt's position carried certain attributes of a "policymaking" position. The binding factual findings of the jury indicate that Hunt was not — under the Supreme Court's and our own doctrine — a "policymaker" for the purposes of the *Elrod* excep-

tion to the First Amendment. To set aside those facts in order to rely on an equivocal balancing of the *Fazio* factors is to lose sight of the forest for the trees.

**[6]** Moreover, dismissals on the basis of political considerations must further a "vital government end" because they infringe upon a constitutional right. *Elrod*, 427 U.S. at 363 ("[Such dismissals] must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights."). Crucially, "since . . . it is the government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests, *the burden of establishing this [policymaker] justification as to any particular respondent will rest on the [government].*" *Id.* at 368 (emphasis added).

**[7]** Here, the government has not sufficiently established the interest at stake, and has thus failed to meet its burden. Indeed, expanding the legal protection accorded to politically-motivated dismissals and demotions could very well undermine vital government interests. For example, an expansion of the exception could discourage some of the most capable and qualified people from running for higher office, and may also have a chilling effect on whistleblowing. Most persuasively, the jury, in its answers to the special interrogatories, found as a matter of fact that Hunt's actions did not disrupt the efficient operation of the OCSD, nor could anyone have reasonably thought they would. *Cf. Thomas*, 881 F.2d at 831 ("[E]ven in a police department, the complained-of disruption must be real, and not imagined.") (internal quotation marks and citation omitted). Therefore, we conclude that the government has failed to establish that Hunt's dismissal furthered a vital government interest.

Nothing in the record persuasively suggests that political considerations are an appropriate requirement for Hunt's position. Because the jury found that political considerations were

not an appropriate requirement, we conclude that Hunt does not fall within the intended scope of the policymaker exception. That one can marshal colorable arguments to conclude that a majority of *Fazio* factors apply in a given case is not sufficient reason to widen what the Supreme Court has deemed a narrow exception to the First Amendment, particularly where, as here, such an expansion is at odds with the underlying purpose of that exception. *See Elrod*, 427 U.S. at 366; *Branti*, 445 U.S. at 518.

## C.

**[8]** Moreover, the district court's analysis of the *Fazio* factors led it to wrongly conclude that Hunt's position was that of a policymaker. Although the *Fazio* factors are not necessarily dispositive, they suggest Hunt was not a policymaker, and was thus entitled to constitutional protection against his retaliatory demotion.

A sheriff's lieutenant is not automatically a policymaker. *Thomas*, 881 F.2d at 832 (reversing dismissal of lieutenant's First Amendment retaliation claim). Therefore, the district court properly considered Hunt's actual job requirements and responsibilities in applying the *Fazio* factors. In *Fazio*, we set forth "[s]ome factors to be considered when determining whether a job is a policymaking position," including "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." 125 F.3d at 1334 n.5. These factors are intended to guide the "policymaker" analysis, but not supplant what we have called "the essential inquiry" — whether "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 1331. Because the parties agreed the court should not propound special jury interrogatories regarding relative pay and stipulated

that Hunt's position required technical competence, only seven of the nine *Fazio* factors are at issue.

**[9]** Although the district court, by using as many as thirty-seven special interrogatories, adopted a novel approach to resolving the question of Hunt's status, its conclusion that Hunt was a policymaker was directly contradicted by the jury's response to those interrogatories. The jury's findings of fact suggest that at least three *Fazio* factors—vague or broad responsibilities, authority to speak in the name of policy-makers, and influence on programs—strongly indicate that Hunt was not a policymaker. Indeed, the jury found that: Hunt did *not* have a vaguely worded job description; Hunt did *not* have authority to speak to the media without prior approval of higher-ranking officials; Hunt did *not* have policymaking authority over any area of policy; Hunt did *not* formulate, substantially influence, or substantially influence modifications to any department-wide policy; Hunt did *not* formulate or substantially influence plans to implement the broad goals of the OCSD department-wide; Hunt did *not* formulate policy that affected San Clemente; and Hunt did *not* exercise discretion in setting policy for the OCSD in San Clemente.

Hunt's power to control others, another *Fazio* factor, was severely limited. Hunt lacked any power to hire or promote the officers that worked under him in San Clemente. *Cf. McCloud v. Testa*, 227 F.3d 424, 429 (6th Cir. 2000) (holding that employee did not fall within the "policymaker" exception where he supervised employees "but did not hire or fire them [and] was not responsible for their raises or granting leaves"). Hunt did have limited ability to impose discipline and manage deployments, but only within the contours of the department policy that was set by his superiors. This authority is both limited and largely operational. We agree that "merely being a supervisor/administrator . . . is not sufficient to show that political affiliation is an appropriate requirement for the job in question." *Milazzo v. O'Connell*, 108 F.3d 129, 133 n.1 (7th Cir. 1997).

The three remaining factors — contact with elected officials, public perception, and responsiveness to partisan politics and leaders — weigh in favor of classifying Hunt as a policymaker. However, despite his interactions with the San Clemente City Council and its citizenry, Hunt was at all times bound by department policy that was set by his superiors and over which he had little, if any, control or influence. His interactions with San Clemente politicians and public are insufficient to elevate his administrative role into a political role. Indeed, the jury found that, despite his responsibilities, Hunt had no regular interaction with the OCSD's political leadership. The jury found that Hunt did *not* directly and regularly communicate with Carona, and that it was, in fact, unusual for the two to speak, as Hunt would commonly speak with his supervisor or other department officials when confronted with San Clemente policy-related decisions.

**[10]** The picture painted by the jury's factual findings shows that Hunt was one of sixty department lieutenants, with no authority to formulate policy, who reported to a supervisor, and who needed approval from higher-ranking officials to speak on behalf of the department. He did have heightened administrative responsibility over San Clemente, which accounts for a small fraction of Orange County's population, where the effective performance of his job was neither compromised by his statements during the campaign, nor dependent on Carona's trust in him. We thus conclude that the *Fazio* factors, with all reasonable inferences drawn in favor of Hunt, *Reeves*, 530 U.S. at 150, and in light of the jury's findings of fact, support the conclusion that Hunt was not a policymaker.

In *Bardzik v. County of Orange*, 635 F.3d 1138 (9th Cir. 2011), we held that another OCSD lieutenant who was the Reserve Division Commander, and was also demoted by Carona after supporting Hunt's candidacy, was a policymaker for the purposes of the *Elrod* exception. Although the legal principles we applied in *Bardzik* are applicable here, the result in

*Bardzik* is not controlling because the "policymaker" inquiry is highly fact-specific.

The position at issue in *Bardzik*—Reserve Division Commander—is factually quite distinct from Hunt's position in the OCSD. Unlike Hunt, Bardzik's duties went well beyond the administration of a small division and included significant programmatic authority. As Reserve Division Commander, Bardzik was in charge of six hundred reserve officers, *id.* at 1141, compared to the fifty-six officers that Hunt oversaw in San Clemente. Bardzik reported directly to Carona and would meet with him face-to-face as much as several times a week at times, *id.* at 1142, significantly greater contact than Hunt's rare interactions with Carona. While the jury found that Hunt's job description was not vaguely worded, Bardzik was broadly tasked by Carona to "take command of the Reserve Division, clean it up and bring it back to responsibility," "get rid of the dead wood," and ensure it was no longer "being led like a badge and gun club." *Id.* at 1141-42.

Bardzik also had significant programmatic authority, under which he initiated "proactive programs," which included establishing a high-tech unit and reforming the swift-water rescue responder program. *Id.* at 1142. Bardzik further created department-wide policy, recommending a decentralization of the division, which was praised by Carona as one of the "highlights of the year," as well as a new promotional protocol to eliminate favoritism. *Id.* Under both the stated purpose for the *Elrod* exception and the *Fazio* factors, the position evaluated in *Bardzik* is significantly more amenable to classification as a "policymaking" position than Hunt's OCSD position. Thus, our analysis of the lieutenant position in *Bardzik* does not control our conclusion here.

### D.

**[11]** We agree with the district court, however, that although Carona's demotion of Hunt in retaliation for cam-

paign speech violated the First Amendment, Carona is entitled to qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " *Id.* at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal alterations omitted).

**[12]** Hunt's First Amendment right to be free from demotion for campaigning against Carona was clearly established as of June 2006. As we held in *DiRuzza*, "[u]nder *Elrod* and *Branti*, decided by the Supreme Court in 1976 and 1980, and under Ninth Circuit case law decided prior to 1995, it was clearly established that a non-policymaking public employee in a sheriff's office is protected from retaliation for the exercise of First Amendment rights." 206 F.3d at 1313. However, the critical question here is whether a reasonable official in Carona's position should have known that Hunt was not a policymaker whose political loyalty was important to the effective performance of his job. *See Lopez-Quinones v. Puerto Rico Nat'l Guard*, 526 F.3d 23, 27 (1st Cir. 2008) ("The crucial question here is whether a reasonable official acting at the time of Lopez' termination should have known on what side of the *Elrod*/*Branti* line Lopez' own position fell."). If Carona "could . . . have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right," he is entitled to qualified immunity. *Greene v. Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009) (citing *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001)).

**[13]** We conclude, like the district court, that Carona could have reasonably but mistakenly believed that Hunt's demotion was not unconstitutional, given the unique nature of his job as Chief of Police Services for the City of San Clemente. Although Hunt's position had no department-wide policy-making responsibility, influence, or control, as the jury found, Hunt exercised discretion over the implementation of OCSD policy within San Clemente, influenced OCSD policy as it affected San Clemente, and formulated plans to implement OCSD policy in San Clemente. While Hunt had to secure authority before speaking with the public, when he did so, it was on behalf of the OCSD. We have carefully analyzed the development of the policymaker exception, its underlying purpose, the high burden on the government to prove that political fidelity was a necessary requirement of Hunt's job, and balanced the nine-factor *Fazio* analysis that requires a fact-dependent inquiry. Even if Carona engaged in the appropriate analysis and wrongly concluded that Hunt was a policymaker such that demoting him was constitutional, we cannot say that he acted objectively unreasonably in concluding he could demote Hunt without violating his constitutional rights.

## III.

The district court did not abuse its discretion in denying Hunt's motion to amend the pretrial conference order. "We review the district court's denial of a motion to modify a pretrial order for abuse of discretion." *Byrd v. Guess*, 137 F.3d 1126, 1131 (9th Cir. 1998), *superseded by statute on other grounds*. District courts have "broad discretion to manage discovery and to control the course of litigation under Federal Rule of Civil Procedure 16." *Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 833 (9th Cir. 2011). Where, as here, the district court has entered a pretrial order, modifications are allowed "only to prevent manifest injustice." Fed. R. Civ. P. 16(e). We have explained:

> The district court should consider four factors in determining whether to modify the parties' pretrial

order: (1) the degree of prejudice or surprise to the defendants if the order is modified; (2) the ability of the defendants to cure any prejudice; (3) the impact of the modification on the orderly and efficient conduct of the case; and (4) any degree of willfulness or bad faith on the part of the party seeking the modification.

*Byrd*, 137 F.3d at 1132.

In light of these factors, we hold that the district court did not abuse its discretion in denying the motion to amend the pretrial order. First, amendment would have caused prejudice or surprise to Carona because Hunt had abandoned any *Monell* claim asserted in his complaint by filing two memoranda of contentions of fact and law and a proposed pretrial order that did not include any *Monell* claim.[1] Allowing Hunt to raise the *Monell* claim through an amendment to the pretrial order would have prejudiced the County because it had taken no discovery toward defending against a *Monell* claim. Second, Hunt's motion was made less than three weeks before trial began, which would have left insufficient time to cure that prejudice. Finally, the amendment would have interfered with the orderly and efficient conduct of the case because curing the prejudice would have required reopening discovery, which, in turn, would have delayed the proceedings.

**[14]** We have "consistently held that issues not preserved in the pretrial order have been eliminated from the action." *S. Cal. Retail Clerks Union and Food Emp'rs Joint Pension Trust Fund v. Bjorklund*, 728 F.2d 1262, 1264 (9th Cir. 1984).

---

[1]Hunt argues that his reference to the actions of "Defendants" in the plural suggest that he preserved a *Monell* claim. Simply grouping the County in with Carona is insufficient to establish a *Monell* claim, which requires allegations that the County's "customs or policies caused a violation of [Hunt's] constitutional rights." The pretrial documents do not reveal any contention that the County's policies or customs lead to Carona's action.

Because the pretrial order did not include a claim against the County, the district court was within its power to *sua sponte* dismiss the County from the action. *See* Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party."). *Cf. Trujillo v. Crescent Jewelers*, 243 F.3d 550 (9th Cir. 2000) ("Federal courts may, in fact, dismiss sua sponte pursuant to F.R.C.P. 12(b)(6) when it is clear that the plaintiff has not stated a claim upon which relief may be granted.").

## IV.

We affirm the district court's judgment as a matter of law in favor of Defendant Sheriff Michael Carona.[2]

**AFFIRMED.**

---

LEAVY, Circuit Judge, concurring in part and dissenting in part:

Pursuant to the Supreme Court's decision in *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009), we need not decide whether a constitutional violation exists before we reach the question of qualified immunity. Because the majority has chosen to reach the issue whether Carona's conduct violated Hunt's constitutional rights, I am compelled to concur in only Sections II. D., III and IV of the opinion. I dissent from the majority's holding that Hunt was not a "policymaker."

---

[2]We also affirm the denial of Hunt's motion to vacate and for a new trial pursuant to Federal Rules of Civil Procedure 59(e) and 60(b)(1), (6). Hunt fails to make any legal arguments that would satisfy the standards set forth in Rules 59(e) and 60(b)(1), (6). Hunt merely reiterates his merits arguments related to the "policymaking," qualified immunity, and *Monell* issues discussed above.

In determining whether an employee is a policy maker, the "ultimate inquiry is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel*, 445 U.S. 507, 518 (1980). Following *Branti*, we have explained that the policymaker exception is not limited to "party affiliation," but includes termination based on "political affiliation, which includes commonality of political purpose and support." *Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (9th Cir. 2001) (citation and internal quotation omitted).

Because "[t]he nature of the responsibilities is critical" to a determination whether a particular employee holds a policy-making position, *Elrod v. Burns*, 427 U.S. 347, 367 (1976), we have set forth nine factors that should be taken into account in the analysis: "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." *Bardzik v. County of Orange*, 635 F.3d 1138, 1145 (9th Cir. 2011) (citing *Fazio v. City and County of San Francisco*, 125 F.3d 1328, 1334 n.5 (9th Cir. 1997). Contrary to the majority's opinion, the district court did not consider these factors in a vacuum, but applied them in light of the overarching question, whether effective performance of the Chief of Police Services for the City of San Clemente required a commonality of political purpose with the Orange County Sheriff. As is discussed below, the district court's affirmative answer to this question is amply supported both by the jury's answers to the special interrogatories and Hunt's testimony.

*Job Responsibilities*. The jury found that Hunt's job responsibilities were "restricted to implementing the Department's goals within a general framework provided by the Department," and "restricted to implementing the City of San Clemente's goals within a general framework provided by the

Department." However, the jury also found that Hunt was responsible for "formulat[ing] plans to implement the broad goals of the OCSD in the City of San Clemente, and had "discretionary authority regarding the deployment of deputy sheriffs within" the City. Hunt's responsibilities were remarkably similar to those described in *Bardzik*, where the police lieutenant/policymaker was "in effect running the Reserves," but was restricted by Carona's instruction to "run the Reserves like every other division." *Bardzik*, 635 F.3d at 1146. Thus Hunt's job responsibilities, like Bardzik's, were broad enough to support policymaker status.

*Relative Pay and Technical Competence*. As noted by the majority, the parties agreed the court should not propound special jury interrogatories regarding relative pay and stipulated that Hunt's position required technical competence.

*Power to Control Others*. Hunt testified he supervised approximately 56 employees as Chief of Police Services for the City of San Clemente. While the parties stipulated Hunt lacked the power to hire employees under his command or determine criteria for promoting them, the jury concluded that "Hunt resolve[d] official complaints from citizens regarding the conduct of employees under his command" and "in some instances," had "the authority to determine the type of discipline to be imposed on any subordinate under his command." The majority distinguishes *Bardzik* based on the greater number of officers supervised, Bardzik was in charge of only part-time volunteers. Hunt, by contrast supervised the active police force for an entire city. Moreover, Bardzik did not supervise the reserves while they were working in other divisions, he did not train the reserves, and he referred personnel problems to the Department's Personnel Division." *Id.* at 1141, 1146. Hunt, by contrast, was the sole supervisor of his employees, resolved complaints regarding employee conduct, and was authorized to make disciplinary decisions.

*Authority to Speak in the Name of Policymakers*. While the jury found that Hunt lacked authority to speak with the media

without the prior approval of either higher ranking OCSD officers or the OCSD's Public Information Officer, it also concluded that Hunt regularly interacted with the San Clemente City Council on behalf of OCSD, made comments to the media, and regularly interacted with the public as a representative of the OCSD concerning law enforcement matters in San Clemente. Thus, Hunt regularly was authorized to communicate on OCSD's behalf with elected officials and the public. The majority apparently holds that it doesn't matter that Hunt acted as a spokesperson for the OCSD in San Clemente.

*Influence on Programs or Policy*. The jury found that Hunt did not formulate or substantially influence policy for the Orange County Sheriff's Department ("OCSD") that applied department-wide, but that he "substantially influenced" policy for the OCSD that affected the City of San Clemente, formulated plans to implement the broad goals of OCSD in the City of San Clemente, and exercised discretion regarding how to implement the policies of the OCSD in the City. Hunt conceded he was a leader, a decision-maker, and manager in the OCSD, and made daily decisions on how to run the [law enforcement] operation in San Clemente. The majority repeatedly refers to Hunt's inability to make policy county-wide as a basis for concluding his job responsibilities were not those of a policymaker. The inability to make county-wide policy does not negate Hunt's extensive authority to make policy in San Clemente. There is no case which stands for the proposition that a "policymaker" within a particular jurisdiction must have authority to make policy for the entire jurisdiction. In fact, Hunt's influence on policy is strikingly similar to the lieutenant/policymaker in *Bardzik*, who could not "unilaterally create policy," but "influenced many . . . programs within the division he supervised." *Id.* at 1146.

The majority concedes the three remaining factors, contact with elected officials, public perceptions, and responsiveness to partisan politics and leaders, weigh in favor of classifying

Hunt as a policymaker. The jury's finding on these factors was that Hunt regularly interacted with the City Council and the public, the public perceived Hunt represented the OCSD in the City of San Clemente and Hunt's position required him to be responsive to City Council members and other political leaders in Orange County.

In sum, the evidence shows that Hunt was responsible for formulating plans to implement OCSD policy in San Clemente, had the ability substantially to influence OCSD policy in the City, spoke regularly with city elected officials and citizens on behalf of OCSD, and was perceived by the public as representing OCSD in San Clemente. Thus, applying the relevant factors, Hunt was in a position for which political loyalty was an appropriate requirement and the "policymaker" exception applies.

In addition to these factors, in *Bardzik* we found persuasive in the policymaker determination the fact that the lieutenant actively sought to undermine the Sheriff's policies. *Id.* at 1148. Here, this consideration is even more significant. Bardzik merely supported Hunt in the contested election, while Hunt campaigned on a platform accusing Carona of corruption. In *Bardzik* by a divided court we held that the district court erred in finding that the lieutenant who supported Hunt was not a policymaker. In this case by a divided court we hold that the district erred in finding that the candidate was a policymaker. "An elected official need not retain a high-ranking official in a position to undermine the official's credibility and goals when neither the electorate nor an appropriate agency has determined that the official has violated the law." *Id.* at 1149. Carona did not violate the Constitution when he removed Hunt from his position as Chief of Police.